UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

GRETCHEN BROOKS, an individual,

Plaintiff,

v.

HARLON RIP CASWELL, an individual, RIP CASWELL SCULPTURES, INC., an Oregon corporation d/b/a CASWELL GALLERY, an Oregon assumed business name, CASWELL PROPERTIES, INC., a Washington limited liability company, and DOES 1-5,

Defendants.

Case No.: 3:14-cv-1232-AC

OPINION AND ORDER

---

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Gretchen Brooks ("Brooks") seeks an order from the court disqualifying Michael R. Seidl ("Seidl") from continuing to represent defendants Harlon Rip Caswell ("Caswell"); Rip

Caswell Sculptures, Inc. d/b/a as Caswell Gallery ("RCS"); and Caswell Properties ("CP") (collectively "Defendants") in this action. Brooks argues Seidl's prior representation of Defendants in two prior lawsuits, and his expected participation as a witness in this trial, necessitates his disqualification under Oregon Rules of Professional Conduct ("Rules") 1.7 and 3.7, and the "unsworn witness" rule.

The court finds Brooks has failed to present evidence Siedl's testimony is or may be prejudicial to Defendants and, therefore, has failed to meet the high standard necessary to successfully support her motion for disqualification. Consequently, Brooks's motion for disqualification is denied.

*Preliminary Evidentiary Issues*

Defendants offer pages from the deposition transcript of Laura Walker ("Walker"), Brooks's counsel in the underlying litigation, taken on February 16, 2015. The cover page of the Walker deposition identifies the case for which the deposition was taken and the party being deposed. A signature page from the court reporter is not included. Defendant also offers pages from a second deposition, which is identified by a tab, and an index provided to the court but not filed in this action. Neither the cover page nor a signature page is provided. The first page of the second deposition indicates it is an unedited, non-certified rough draft transcript and specifically provides: "This rough draft may NOT be quoted from in any pleadings or used in court to quote from, or for any other purpose, or may not be filed with any court and may not be distributed to any other party." It is impossible to tell who is being deposed, the case for which the deposition was taken, or the parties participating in the deposition.

Defendants' deposition excerpts are not properly authenticated. "The requirement of

authentication * * * as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a). The Ninth Circuit has instructed that a deposition, or extract therefrom, is properly authenticated when the name of the deponent and the action for which the deposition was taken are identified and the reporter's certification that the deposition is a true record of the testimony of the deponent is included. *Orr v. Bank of America*, 285 F.3d 764, 774 (9th Cir. 2002). This is generally accomplished by providing the cover page of the deposition as well as the reporter's certification to each deposition extract submitted. *Id.*

Brooks has offered, and properly authenticated, excerpts from the same depositions. Accordingly, Defendants' deposition transcripts are properly authenticated through Brooks's submissions and will be considered by the court. *Orr*, 285 F.3d at 776 ("[W]hen a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity.")

*Background*

I. Brooks Lititgation

In January 2011, Brooks filed suit against Defendants seeking to recover amounts she provided Caswell to further his sculpture business ("Brooks Litigation"). Defendants hired Seidl to defend them in the action and Seidl associated Phil Nelson as co-counsel. (Hahs Decl. dated Feb. 23, 2015 ("Hahs 2015 Decl.") ¶ 7; Seidl Decl. ¶1.) Following a trial, which clarified but did not resolve all of the issues, the parties entered in to a settlement agreement on September 21, 2011 (the "Agreement"). (Monson Decl. ¶¶ 3, 4.)

Brooks's counsel, Jon Monson ("Monson") and Walker, initiated the settlement discussions by presenting a lengthy and complex settlement proposal to Seidl and Caswell the morning of August 29, 2011.[1] (Seidl Decl. ¶ 4.) Seidl asked Walker to forward the proposal to Andrew Hahs, an attorney retained in November 2009[2] by Caswell to represent his business interests. (Seidl Decl. ¶ 4; Walker Dep. 50:18-51:8[3]; Caswell Decl. ¶ 2.)

The terms of the Agreement were negotiated on August 29 and 30, 2011.[4] (Seidl Decl. ¶¶ 4-5; Hahs Decl. ¶¶ 12,15.) ) Seidl and Hahs represented Defendants in the negotiations and divided responsibilities, with Seidl taking the lead on "litigation-related items," and Hahs handling the business and transactional aspects, including the Note. (Hahs 2015 Decl. ¶ 3; Seidl Decl. ¶¶ 4,7.) Monson, Walker, Seidl, and Caswell were present for both days of the settlement negotiations, while Hahs attended the second day only. (Monson Decl. ¶ 6; Hahs 2015 Decl. ¶ 15; Seidl Decl. ¶¶ 4 -7.)

Walker remembers discussions about the terms of the Note during the two-day settlement negotiations:

> The promissory note under 5(c), I recall there were lots of discussions about the note, but, again, I don't know if it was this particular day or the next day in terms of dollar amount, the payment schedule, the guarantees. Under paragraph C it refers to guarantees, which were not ultimately included in the settlement. So I don't recall if that was something that the parties said no at that particular meeting or at some

---

[1]The deposition of Caswell was scheduled to occur on August 29, 2011. (Walker Dep. 52:15-17; Monson Dep. 23:10-16.)

[2]In a previous declaration, Hahs represents Caswell initially retained him in November 2010. (Hahs Decl. dated Dec. 11, 2014 ("Hahs 2014 Decl.") ¶ 2.)

[3]The declarations referenced herein are exhibits to the Fite Declaration filed on March 9, 2015.

[4]Monson incorrectly identified the two-day period as August 28 and 29, 2011, in his declaration. (Monson Decl. ¶ 5.)

later date. But I'm sure there were discussions about the note at some point in time.

(Walker Dep. 62:21-63:5.) She considered Seidl to be the lead negotiator with Hahs taking the lead on the documents. (Walker Dep. 73:9-16.) However, she could not remember who negotiated the specific terms of the Note. (Walker Dep. 73:17-74:16; 77:4-78:12.)

Monson remembers Seidl objecting to the identification of Caswell's new entity, rather than RCS, as the maker of the Note based on Caswell's desire to keep a bright line between his new and old corporations, and that change being accepted. (Monson Dep. 32:15-35:14.) He is confident additional negotiations occurred with regard to the terms of the Note, collateral and security agreement, but is not sure what day those discussions took place or who said what. (Monson Dep. 46:6-48:16.) He does remember Seidl raising the "sole-remedy" concept with regard to the Note on August 29, 2011, but is unable to explain why the August 30, 2011, term sheet did not reflect this. (Monson Dep. 55:1-56:10.)

The term sheet distributed by Monson at the close of negotiations memorialized the core terms of the Agreement. (Hahs 2015 Decl. ¶16.) Hahs represented Defendants' interest in drafting, fine tuning, and finalizing the Agreement and related documents, working directly with Monson and Walker, and seeking direction from Seidl on litigation aspects only. (Hahs 2015 Decl. ¶ 17; Walker Dep. 90:18-91:18.)

Pursuant to the terms of the Agreement, Caswell executed a Non-Recourse Promissory Note as President of RCS in the amount of $650,000 payable to Brooks in monthly installments over a seven-year term (the "Note"). (Hahs 2014 Decl. Ex. B.) The Note was secured by a security interest in various sculpture molds (the "Molds") and reproduction rights as described by the Agreement. (Hahs 2014 Decl. Ex. B at 1.) The Note specifically provided it is:

> NON-RECOURSE against RCS, its officers, directors, shareholders or employees, except for the collateral specified in the Settlement Agreement as set forth therein. Brooks shall look only to such collateral for satisfaction and payment of any sums due under the terms of this note in the event of any default by RCS.

(Hahs 2014 Decl. Ex. B at 2.) Seidl made no representations with regard to the value of the collateral. (Seidl Decl. ¶ 12.)

## II. Ferris Litigation

In July 2011, Seidl filed a lawsuit on behalf of Defendants against Kimball H. Ferris, the attorney representing Defendants from October 2005 through November 2009 ("Ferris Litigation"). (Hahs 2014 Decl. Ex. A at 4.) Defendants alleged claims for legal malpractice, negligence, and breach of fiduciary duty based on conduct during, and failure to properly document, the funding arrangement between Brooks and Defendants which resulted in the Brooks Litigation, and sought damages relating to the liabilities incurred by Defendants in connection with the Brooks Litigation. (Hahs 2014 Decl. Ex. A at 4.) Once the terms of the Agreement were solidified, Seidl identified the Note, which he valued at $650,000, as part of the economic damages suffered by Defendants. (Fite Decl. dated February 2, 2015 ("First Fite Decl.") Ex. 1 at 13, Ex. 2 at 3.)

Under the terms of the Agreement, Brooks was awarded an interest in the Ferris Litigation. (Hahs 2014 Decl. Ex. A at 15.) Defendants gave Brooks a legal right to twenty-five percent of the net proceeds of the Ferris Litigation. (Hahs 2014 Decl. Ex. A at 15.) In late June, 2012, Brooks was deposed in the Ferris Litigation. (Compl. ¶ 23.) The parties settled the Ferris Litigation in early August 2012 and Brooks received her share of the settlement. (Compl. ¶25; Answer ¶ 25.)

## III. Default on Note

On August 3, 2012, Walker emailed a notice of default on the Note to Seidl. (Hahs 2014

Decl. Ex. D; First Fite Decl. Ex. 4 at 2.) Walker indicated RCS had not paid the $4,000 due under the Note on August 2, 2012. (Hahs 2014 Decl. Ex. D; First Fite Decl. Ex. 4 at 2.) In response, Hahs advised Walker that RCS would not be making the August payment and Brooks was free to exercise her rights to the collateral. (Hahs 2014 Decl. Ex. E at 1; First Fite Decl. Ex. 4 at 1.) On October 4, 2012, Hahs informed Walker of Caswell's intent to move the sculpture molds he owned from the Parks foundry, where they were stored, to another location, and leave the Molds securing the Note at Parks. (Hahs 2014 Decl. Ex. F at 1.) He recommended Brooks contact Parks to arrange payment for future storage fees. Hahs represented:

> Rip has received no interest in castings from the molds in which Gretchen has the security interest and he believes they have little value. However, as a one-time offer, Rip is willing to pay Gretchen $10,000 to release her security interest in all the molds. Let me know in the next seven days if she is interested in this offer. If not, Rip will proceed to unload the molds and leave them at Parks. We can then finalize the surrender agreement.

(Hahs 2014 Decl. Ex. F at 1; First Fite Decl. Ex. 5.) On April 8, 2013, Brooks rejected the offer, and Walker and Hahs cooperated in preparing a collateral surrender agreement. (Hahs 2014 Decl. Exs. G, H; First Fite Decl. Ex. 4 at 5.) Caswell currently represents the total retail value of the reproductions which could be made from the Molds at $24,981,450, but that "the value of the molds is entirely dependent upon the owner's desire and ability to cast, market, and sell the reproductions in the right business circumstances." (Caswell Decl. ¶ 9.)

IV. Current Litigation

Brooks filed this action on July 31, 2014, asserting claims for fraud, negligent misrepresentation, breach of contract, breach of the duty of good faith and fair dealing, conversion, and elder financial abuse based on allegations Caswell never intended to pay the Note and entered

into the Agreement for the purpose of obtaining Brooks's cooperation in the Ferris Litigation (the "Complaint"). Seidl is once again representing Defendants.

In a letter to Seidl dated August 11, 2014, Brooks's raised concerns regarding Seidl's ability to represents Defendants in this action, stating "[b]ecause it appears that you have extensive personal knowledge of the discussions, you may need to evaluate your ability to represent Mr. Caswell consistent with ORPC 3.7" (Fite Decl. dated March 4, 2015 ("Second Fite Decl.") Ex. 4 at 2.) Brooks requested Seidl's availability for the taking of his deposition in early January 2015, but then decided to postpone the deposition until April, 2015. (Seidl. Decl. ¶ 18.)

*Legal Standard*

The decision to grant a motion for disqualification of counsel is within the sound discretion of the district court. *Gas-A-Tron of Az. v. Union Oil Co.*, 534 F.2d 1322, 1325 (9th Cir. 1976). In exercising that discretion, the district court faces several competing tensions. On the one hand, the Ninth Circuit has counseled:

> It must be remembered that the attorney in such situations as this does not have the shelter enjoyed by a defendant whose adversary must meet a burden of proof. Where conflict of interest or abuse of professional confidence is asserted, the right of an attorney freely to practice his profession must, in the public interest, give way in cases of doubt.

*Chugach Elec. Ass'n v. U.S. Dist. Ct.*, 370 F.3d 441, 444 (9th Cir. 1996) (granting writ of mandamus directing the disqualification of attorney who previously represented opposing party in another matter, where there was a likelihood that private matters learned during the prior representation could be used in a manner adverse to the former client.) On the other hand, a motion to disqualify current counsel is subject to "particularly strict judicial scrutiny" because of the potential for "misuse of [state ethical] rules for tactical purposes." *Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.*,

760 F.2d 1045, 1050 (9th Cir. 1985)(quoting *Rice v. Baron*, 456 F. Supp. 1361, 1370 (S.D.N.Y. 1978)). The competing interests involved in a conflict of interest case require the court to strike a delicate balance that prevents unreasonable restrictions on an attorney's ability to practice law while nonetheless upholding the system's integrity requiring a high standard of proof on the party moving to disqualify substitute counsel. *Smith v. Cole*, No CV 05-372-AS, 2006 WL 1207966, at *1-*2 (D. Or. March 2, 2006). Any doubts must be resolved in favor of disqualification. *Id*. The federal courts apply state law in determining matters of attorney disqualification. *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000).

*Discussion*

Brooks moves to disqualify Seidl from representing Defendants based on a conflict of interest. Brooks contends Seidl will have to testify on behalf of Defendants regarding Caswell's intent and performance of the Agreement. Brooks represents she will call Seidl as an adverse witness to testify with regard to the allegation of damages in the Ferris Litigation and the representations made during the negotiation of the Agreement, which may very likely contradict Caswell's testimony. Finally, Brooks asserts that even if Seidl does not testify, his participation in the trial with be prejudicial to her in light of Seidl's ability to inject first-hand knowledge at the trial without swearing under oath or being subject to cross-examination.

I. Rule 3.7

The Rules provide:

> (a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a witness on behalf of the lawyer's client unless:
>
> > (1) the testimony relates to an uncontested issue;

> (2) the testimony relates to the nature and value of legal services rendered in the case;
>
> (3) disqualification of the lawyer would work a substantial hardship on the client; or
>
> (4) the lawyer is appearing *pro se*.
>
> (b) A lawyer may act as an advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness on behalf of the lawyer's client.
>
> (c) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a member of the lawyer's firm may be called as a witness other than on behalf of the lawyer's client, the lawyer may continue the representation until it is apparent that the lawyer's or firm member's testimony is or may be prejudicial to the lawyer's client.

OR. R. PROF'L CONDUCT 3.7 (2014).

*A. Rule 3.7(a)*

Rule 3.7(a) applies when a lawyer is likely to be called as a witness on behalf of his client. Seidl states he does not anticipate calling himself as a witness at trial in that he has no unique or relevant admissible evidence that can not be provided by other witnesses or documents. (Seidl Decl. ¶¶ 14, 15.) Additionally, Caswell represents he has "expressly consented to Mr. Seidl not being called as a witness on my behalf at trial." (Caswell Decl. ¶ 16.) In light of these representations, a likelihood Seidl will be called to testify on behalf of Defendants does not exist. Accordingly, disqualification under Rule 3.7(a) is not warranted.

*B. Rule 3.7(c)*

Rule 3.7(c) prevents a lawyer from representing a client after the lawyer learns he may be called as a witness on behalf of another party. The lawyer must discontinue representation when it becomes apparent his testimony is or may be prejudicial to his client. The relevant issues to be

decided by the court are: (1) whether the lawyer will testify; and (2) whether the lawyer's testimony is or may be prejudicial to his client.

Seidl argues because others are available to testify with regard to the settlement negotiations, he is not a "necessary" witness and, therefore, disqualification is inappropriate. The cases on which Seidl relies apply a slightly different version of Rule 3.7 found in the American Bar Association Model Rules of Professional Conduct ("Model Rules") which provides, in pertinent part:

> (a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>
> (3) disqualification of the lawyer would work substantial hardship on the client.

The Model Rules clearly put the necessity of a particular witness at issue, while the Rules do not. Accordingly, the question of whether Seidl is a necessary witness is not relevant here.

Similarly, Brooks's reliance on *In Re Kluge*, 335 Or. 326 (2003) is misplaced. In *Kluge*, "the accused worked both as the general manager and as legal counsel" for Tel-Ad, the entity accused of discrimination and wrongful termination. *Id*. at 329. In fact, Kluge directly supervised Fischer, the deaf employee who filed the underlying action. *Id*. In support of his wrongful termination claim, Fischer alleged Kluge "threatened to fire him if he pursued an employment discrimination claim" and Kluge did, in fact, terminate Fischer's employment when he learned Fischer planned to pursue his claim. *Id*. at 329-330. Kluge represented Tel-Ad in the discrimination action, and continued to do so after Fischer advised Kluge he intended to call Kluge as a witness. *Id*. at 330.

The court found Kluge violated Disciplinary Rule 5-102(C), which mirrors Rule 3.7(c), by

continuing to represent Tel-Ad after it became evident he would be called as a witness by Fischer and it was likely his testimony would be prejudicial to Tel-Ad. The court explained:

> We determine that, from the outset of the case, the accused learned and it was obvious that he would be called as a witness in Fischer's case against Tel-Ad. As Fischer's direct supervisor, the accused represented Tel-Ad in negotiating Fischer's employment terms and played a central role in the events leading to Fischer's action against Tel-Ad. In his complaint against Tel-Ad, Fischer confirmed that the accused likely would be a material witness in the case because he alleged specific acts of wrongdoing by the accused in Tel-Ad's behalf to support his claim. Fischer's lawyer also repeatedly notified the accused that the accused would be called as a witness and she introduced the accused's written notes and a recorded teletypwrier (TTY) conversation between Fischer and the accused as evidence in the case.
>
> We also determine that, from the outset of the case, it was apparent that the accused's testimony in Fischer's behalf would have been at least potentially prejudicial to Tel-Ad. As a principal actor in the events underlying Fisher's claim against Tel-Ad, the accused would have been called to testify as to the decision to terminated Fisher's interpreter service and the circumstances under which Fischer's employment at Tel-Ad ended. The facts surrounding those events were both disputed and material to Fischer's claim. Further, because Fischer alleged specific acts of wrongdoing by the accused in Tel-Ad's behalf, and because the accused consistently has maintained that Tel-Ad approved of his actions, it is likely that the accused's testimony would have been adverse to Tel-Ad.

*Id*. at 337-38.

The court relied on Kluge's position as an employee of Tel-Ad, and his involvement in Fischer's employment and termination in this capacity, in finding Kluge's continued representation of Tel-As violated the disciplinary rule. This is clear from the court's references to Kluge as "Fischer's direct supervisor" and as "a principal actor in the events underlying Fischer's claim against Tel-Ad." Additionally, the court relied on Fischer's allegations of "specific acts of wrongdoing by the accused in Tel-Ad's behalf" to support his claim as a factor in finding Kluge would likely be a material witness and that his testimony would have been adverse to Tel-Ad.

Here, Seidl is not an employee of Defendants and has not engaged in any conduct in that

capacity. He acted only as Defendants' counsel in the prior actions. Further, Brooks has not alleged any acts of wrongdoing against Seidl. This facts in this case are easily distinguishable from the facts relied on by the court in *Kluge*. Consequently, the analysis and holding enunciated in *Kluge* do not control the issues before the court.

1. Inconsistent Valuation of the Notes/Molds

Brooks represents she intends to call Seidl to testify regarding the "value of the molds to Mr. Caswell, as well as how Mr. Caswell valued the note obligation." (Pl.'s Mot. to Disqualify Seidl as Counsel for Defs ("Pl.'s Mot.") at 9.) Brooks argues Seidl's representation the Note had a value of $650,000 in the Ferris Litigation is directly contrary to Defendants' current position the value of the Note is much less than $650,000 due to the non-recourse provisions. Brooks intends to use this testimony to prove the non-recourse provisions were fraudulently induced.

a. Seidl's Representations in the Ferris Litigation

In a letter to defense counsel in the Ferris Litigation dated March 7, 2012, Siedl identified a $650,000 promissory note executed by Caswell to Brooks as a portion of Defendants' liquidated economic damages. (First Fite Decl. Ex. 2 at 3.) In the proposed amended complaint to be filed in the Ferris Litigation, dated April 5, 2012,[5] Seidl represented that under the Agreement, "Caswell Sculptures would pay Brooks $650,000 under a promissory note secured by the molds for the sculptures created with the use of Brooks's loan advances." (First Fite Decl. Ex. 1 at 13.) Seidl accurately characterized Defendants' obligation to Brooks under the terms of the Note and Agreement. He did not "value" the Note or the Molds, but merely summarized Defendants' existing

[5]In a declaration dated June 26, 2012, Seidl informed the state court he elected to not file the third amended complaint to avoid a postponement of the current trial date. (First Fite Decl. Ex. 1 at 1-2.)

obligations to Brooks, which is consistent with the terms of the Note and Agreement.

b. Inconsistent Testimony

Brooks represents Defendants' current position is that the value of the Note is much less than $650,000. Brooks does not cite to any statement or allegation that would support this statement. It appears Brooks construes Caswell's offer to, in effect, purchase the rights to the Molds for $10,000 from Brooks after RCS defaulted on the Note as evidence the Note has little, if any, value. Brooks then argues this position is inconsistent when considered in conjunction with Seidl's valuation of the Note at $650,000.

Caswell explains in his declaration he made the offer based on his understanding Brooks was not sure she wanted to take possession of the Molds and was interested in an offer from Caswell. (Caswell Decl. ¶ 6.) Caswell then made an offer based on what he could afford to pay at that time. (Caswell Decl. ¶ 6.) He then explained if Brooks accepted possession and ownership of the Molds, she would be entitled to make reproductions from the Molds. (Caswell Decl. ¶ 8.) He estimated the total retail value of the sculptures producible from the Molds at $24,981,450, noting the value of the Molds were contingent on the owner's use of them. (Caswell Decl. ¶ 9.) This evidence established Caswell valued the Molds at anywhere from $10,000, based on his financial status at the time of the offer, to nearly $25,000,000, based on the retail value of sculptures an interested and able owner could produce from the Molds. Any "valuation" of the Note at $650,000 by Seidl in the Ferris Litigation falls within this range and, therefore, could be viewed as consistent with Caswell's testimony. Furthermore, Seidl's "valuation" of the Note in the Ferris Litigation occurred prior to Defendants' default on the Note. Any inconsistencies between his "valuations" in March and April of 2012, while Defendants were current with their payments on the Note, and Caswell's offer

purchase the Molds for $10,000 in October 2012, is distinguishable based on the default on the Note in August 2012.

c. Valuation of Note/Molds

Caswell is available to testify at trial and is the proper party to provide testimony on the value of the Molds to him and future owners of the Molds, as well as how he valued the obligation of the Note. Brooks has presented no evidence Seidl has independent knowledge of the valuation of the Molds or Notes. In fact, Siedl represents he made no representations regarding the value of the Molds. Furthermore, any conversation between Seidl and Caswell regarding Caswell's valuation of the Molds and Note would be subject to the attorney-client privilege and, therefore, inadmissible.

2. Settlement Negotiations

Brooks also intends to call both Caswell and Seidl to "testify regarding Caswell's intent during negotiations, and how that intent was communicated to Brooks." (Pl.'s Mot. at 10.) She speculates:

> [i]t is very likely that Caswell's testimony regarding the Settlement Agreement and settlement negotiations could conflict with Mr. Seidl's. For example, whereas Caswell could testify that he intended provisions of the Settlement Agreement to mean one thing, Mr. Seidl could testify that he represented a different intent in communications with opposing counsel. Mr. Seidl's conflicting testimony would then create a conflict with his client by putting Caswell's credibility at issue.

(Pl.'s Mot. at 10.) She then surmises that "[f]urther discovery in this case may reveal additional evidence that places Mr. Seidl's testimony adverse to Caswell's. (Pl.'s Mot. at 11.)

a. Inconsistent Testimony

Brooks represents she believes Seidl's testimony describing the settlement negotiations will very likely differ from that offered by Caswell. Brooks's supposition that Seidl's testimony would

contradict Caswell's is not supported by the record. Brooks has not deposed Seidl and is, therefore, unable to establish Seidl's testimony may be prejudicial to Caswell. *See Carta v. Lumbermens Mut. Cas. Co.*, 419 F. Supp. 2d 23, 29 (D. Mass. 2006) (speculation on what counsel's testimony might entail provides insufficient basis to disqualify counsel).

b. Caswell's Intent

Brooks also seeks to elicit testimony regarding Caswell's intent from Seidl. Seidl would be privy to Caswell's intent only through communications with his client, which are protected by the attorney-client privilege. Additionally, to the extent Brooks seeks testimony regarding Seidl's intent during the settlement negotiations, evidence of Siedl's intent is not representative of Caswell's intent. In other words, even if Seidl's intent was different from Caswell's intent, they are testifying about their own states of mind which will not result in a contradiction and not put Caswell's credibility at issue.

3. Conclusion

Based on the record currently before the court, Brooks has failed to present evidence Seidl's expected testimony is or may be prejudicial to Defendants. Brooks has not deposed Seidl and is merely speculating on what his testimony might entail. To the extent she has supported expected testimony with evidence, such testimony is not inconsistent with Caswell's expected testimony. Consequently, Brooks has failed to meet the high standard required to disqualify Seidl under Rule 3.7(c).

*C. Rule 1.7*

Brooks asserts Seidl's continued representation of Defendants violates Rule 1.7(a) which provides, in pertinent part:

> a lawyer shall not represent a client if the representation involves a current conflict of interest. A current conflict of interest exists if:
>
> * * *
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client a former client or a third person ro by a person interest of the lawyer.

Brooks argues that a violation of Rule 3.7(c) is also a violation of Rule 1.7(a). The court has found Brooks has failed to present evidence Seidl's expected testimony is or may be prejudicial to Defendants and, accordingly, has failed to establish a violation of Rule 3.7(c). This finding also defeats Brooks's motion for disqualification under Rule 1.7(a).

II. Unsworn Witness

A lawyer with first-hand knowledge of an event to be explored at trial may be disqualified even if he will not be a witness at trial. *U. S. v. Evanson*, 584 F.3d 904, 909 (10th Cir. 2009). Here, Brooks unequivocally states she intends to call Seidl as a witness a trial, making the unsworn witness rule inapposite.

Even if Seidl was not expected to testify, the court is not convinced the unsworn witness rule applies to civil proceedings. In *Evanson*, the Tenth Circuit considered a criminal defendant's right to representation under the Sixth Amendment. The court explained the "unsworn witness problem" arises when an:

> attorney might convey "first-hand knowledge of the events without having to swear an oath or be subject to cross examination." An attorney providing "unsworn testimony" is not at odds with his client – there is no conflict of interest. Rather, "the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired."

*Id*. (quoting *U.S. v. Locascio*, 6 F.3d 924, 933-34 (2nd Cir. 1993))(internal citations omitted). The court reasoned that Rule 3.7 "cannot supplant constitutional standards" and that "such a rule cannot

define the scope of a defendant's Sixth Amendment rights." *Evanson*, 584 F.3d at 910.

> True, rules of professional conduct are relevant in the sense that a court's authority to disqualify counsel stems in part from its interest in "ensuring that criminal trials are conducted within the ethical standards of the profession." But it does not follow that the Sixth Amendment requires courts to identify a strict violation of an applicable ethical rule before disqualifying counsel.

*Id*. (quoting *Wheat v. U. S.*, 486 U.S. 153, 160 (1988))(internal citations omitted).

Evanson, and the cases cited therein address a criminal defendant's right to counsel under the Sixth Amendment. Brooks has not cited to, and the court has not found, any cases relying on the unsworn witness rule in a civil proceeding, where the court is not required to consider the Rules of Professional Conduct in the context of a criminal defendant's rights under the Sixth Amendment. Brooks's reliance on *Chapman Eng'rs, Inc. v. Nat. Gas Sales Co., Inc.*, 766 F. Supp. 949 (D. Kan. 1991) is misplaced. In *Chapman*, the court discussed one of the rationales for Model Rule 3.7 – to prevent jury confusion over the separate roles of an advocate and a witness – and quoted comments to the Model Rules. *Id*. at 957. The court clearly was not considering the interaction between Rule 3.7 and the Sixth Amendment, the context in which the unsworn witness rule applies. Accordingly, in light of the clear reliance on the Sixth Amendment right to counsel in a criminal proceeding in the cases applying the unsworn witness rule, and the absence of any precedent applying the rule to civil cases, the court finds the unsworn witness rule is not applicable here.

Even assuming the unsworn witness rule applies to civil proceedings, Seidl does not have unique first-hand knowledge justifying disqualification. Brooks argues Seidl's first-hand knowledge of the settlement negotiations will allow him to "communicate his approval of Caswell's testimony through his opening and closing statements, and through the questioning of the witnesses." (Pl.'s Mot. at 11.) Seidl is not the only one who attended the settlement negotiations. Brooks has the

knowledge of Walker and Monson, as well as the expected testimony of Caswell and Hahs, and the documentary evidence to assist her in understanding what occurred during settlement negotiations. All counsel will come into trial with a substantially similar understanding of the settlement negotiations. Seidl will, of course, have information provided to him by Caswell, but Brooks will provide information to her own counsel not necessarily available to Seidl. All of the attorneys will question witnesses with knowledge unique to them and will frame their opening and closings statements to the jury to provide the evidence in the light most favorable to their clients. As in any trial, the court will be able to prevent Seidl from discussing facts known only to him, and not disclosed to Brooks or offered at trial, in his opening and closing statements. The unsworn witness rule does not require disqualification in this instance.

*Conclusion*

Brooks's motion (#22) to disqualify Seidl as counsel for Defendants is DENIED.

DATED this 12th day of March , 2015.

/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge