UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| GRETCHEN BROOKS, an individual, | Case No. 3:14-cv-01232-AC |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| HARLON RIP CASWELL, an individual, RIP CASWELL SCULPTURES, INC., an Oregon corporation d/b/a CASWELL GALLERY, an Oregon assumed business name, and CASWELL PROPERTIES, LLC, a Washington limited liability company, | |
| Defendants. | |

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Gretchen Brooks ("Brooks") filed this action against Rip Caswell Sculptures, Inc., d/b/a/ Caswell Gallery ("RCS"), Caswell Properties, LLC, and Harlon Rip Caswell ("Caswell") (collectively "Defendants") alleging, among other claims, fraud, negligent misrepresentation, breach

Page 1 - OPINION AND ORDER                                                                    *{AHS}*

of contract, conversion, and elder financial abuse. (Am. Compl., ECF. No. 80, at 7–10.) Presently before the court is Defendants' Motion for Partial Summary Judgment Re: Claim of Missing Molds (the "Motion") on these claims. (Defs.' Mot. for Summ. J., ECF No. 95.) Based on the evidence before the court, Defendants' Motion is granted.

*Background*

From 2006 to 2009, Brooks loaned Defendants funds intended to develop and expand Caswell's sculpture business. (Am. Compl. ¶ 9; Seidl Decl., ECF. No. 96, Ex. 1, at 1.) Defendants failed to repay the loan. (Am. Compl. ¶ 1.) In 2010, Brooks filed a lawsuit against Defendants in state court, which yielded a jury verdict granting Brooks a net award of $2.88 million. (*Id.* ¶ 11–13.)

In September 2011, the parties entered into a settlement agreement (the "Settlement Agreement"), under which RCS executed a promissory note (the "Note") in the amount of $650,000 payable to Brooks. (*Id.* ¶¶ 14, 15.) The Note was secured by a lien on fifty-five designated molds used by Caswell to cast sculptures (the "Molds"). (*Id.* at ¶ 17; Seidl Decl. Ex. 2.) The Molds were Brooks's only source of recourse in the event of a breach. The Settlement Agreement required Defendants to deliver the Molds to Parks Bronze, a sculpture foundry serving as a third-party custodian, and to allow Brooks access to view and inspect the Molds. (Seidl Decl. Ex. 2 ¶ 8(d).) The Settlement Agreement provides, in relevant part:

> [B]y Nov. 16, 2011, RCS shall deliver the Molds to Parks Bronze[] for storage, and that, absent the written agreement of the Parties to transfer the Molds to another location, the Molds shall remain at Parks Bronze until the Promissory Note is satisfied in full or Brooks enforces her rights under the Security Agreement following a payment default . . . . [Defendants] shall authorize and direct Parks Bronze . . . to . . . provide Brooks (or her designated agent) with access to view and inspect the Molds at any time during business hours.

(*Id.*)

According to Caswell, some of the Molds subject to the Settlement Agreement were already located at Parks Bronze prior to the execution of the Settlement Agreement. (Second Caswell Decl. ¶ 4[1].) Some time on or before November 6, 2011, the remaining Molds appear to have been transported to Parks Bronze. (Seidl Decl. Ex. 3; First Caswell Decl. ¶ 4; First Parks Decl. ¶ 2[2]; Second Caswell Decl. ¶ 3.) These remaining Molds were located within a shipping container along with several of Caswell's other molds, which were not subject to the Settlement Agreement. (Caswell Dep. 42:12–25, 43:1–7; Second Parks Decl. ¶ 3.) Some of the Molds were unlabeled, and some Molds were labeled per Caswell's own operating system, which did not correlate with the descriptive titles used for the purposes of the Settlement Agreement. (Second Caswell Decl. ¶ 6; Second Parks Decl. ¶ 6.)

RCS defaulted on the Note on August 6, 2012. (Am. Compl. ¶ 31.) Caswell testified that once his attorney advised him Defendants would be forced to default on the Note, Caswell "surrendered" the Molds and believed he no longer had access to them. (Caswell Dep. 34:18–20, 36: 4–7.) Defendants then notified Brooks they intended to default on the Note and Brooks was free to exercise her rights in the Molds. (Seidl Decl. Ex. 5, at 1.) Later that month, Defendants advised Brooks all the Molds were located at Parks Bronze and that Caswell intended to "move all of the

---

[1]Caswell has supplied two declarations in support of the Motion. The first, dated December 10, 2014, was submitted as "Exhibit '7'" to the Seidl Declaration, ECF. No. 96, and is referred to as the "First Caswell Decl." The second Caswell declaration, dated December 18, 2015, was submitted independently as ECF. No. 128 in support of Defendants' Reply Memorandum, and is referred to as the "Second Caswell Decl."

[2]Similarly, the record contains two declarations from Steve Parks, Owner of Parks Bronze. The first is dated April 7, 2015, is provided as "Exhibit 5" of the Honoré Declaration, ECF. No. 109, and is referred to as the "First Parks Decl." The second, dated October 27, 2015, was independently submitted as ECF. No. 110 and is referred to as the "Second Parks Decl."

[other] molds back to this area [presumably, his own foundry in Troutdale] except those in which [Brooks] has a security interest." (Honoré Decl., ECF. No. 109, Ex. 2.) Caswell subsequently began to remove his own molds from the shipping container, where the Molds were also located, always cross-checking a list of the Molds so as not to inadvertently remove any of them. (Caswell Dep. 43:14–17.) Steve Parks, ("Parks"), Owner of Parks Bronze, confirmed in 2015, "Caswell moved various molds in and out of the shipping container over the past few years." (Second Parks Decl. ¶ 4.) In January 2013, Defendants, responding to a request from Brooks to conduct an inspection of the Molds, explained the Molds were "scattered in several containers and locations." (Honoré Decl. Ex. 3, at 1.)

Brooks did not attempt to access the Molds, either on her own or through an agent, until September 2014, (Brooks Dep. 150: 9–16,) when she hired Todd Pettelle, Owner and Operator of another bronze casting foundry, ("Pettelle"), to visit Parks Bronze to inventory and visually inspect the Molds, (Pettelle Decl., ECF. No. 111, ¶¶ 2, 3; Pl.'s Resp. to Defs.' First Set of Interrogs., at 9.) On September 9, 2014, Pettelle, working by himself from a list of the Molds' titles from the Settlement Agreement and "piece markings on the outside of each unique mother mold," searched the shipping container at Parks Bronze. (Pettelle Decl. ¶¶ 5, 6.) There is no evidence Pettelle searched any other areas at Parks Bronze. Unable to locate all of the Molds, Pettelle concluded five Molds were missing. (*Id.* ¶ 8.) While taking inventory, Pettelle did not inspect the Molds' internal condition or confirm each Mold's parts did in fact match the identified sculpture. (*Id.* ¶ 6.) Still, Pettelle determined two of the Molds — a life-size mold labeled "Battle," which Pettelle assumed "was most likely 'Fighting Back,'" and "Power of Presence 2011"— were "deteriorated enough that sculptures could not be adequately cast from them," and "could not have been repaired." (*Id.* ¶¶ 9,

10.) Further, based on his visual inspection, Pettelle concluded six other Molds displayed varying degrees of deterioration, which he described as "poor condition," "broken mother molds," and "possible questionable memory loss." (*Id.* ¶ 11.) Pettelle also noted he would likely need to conduct additional testing, beyond mere visual inspection, to determine the actual current quality and "usability" of the Molds. (*Id.* ¶ 12.)

Caswell contends it is "not particularly surprising" Pettelle failed to locate all of the Molds, given "[t]he molds came in pieces[,] and some of the molds were not labeled, or were labeled in a way that Mr. Pettelle would not easily be able to match the label to the [list of Brooks molds]." (Second Caswell Decl. ¶ 10.) Additionally, according to Caswell, the two molds Pettelle deemed unusable are not Molds included in those which are collateral for the Note. (*Id.* ¶ 20.) He indicates the first deteriorated Mold identified by Pettelle, labeled as "Battle," is in fact "Battle" and not, as Pettelle assumed during his inspection, "Fighting Back." (*Id.* ¶ 17.) Caswell also states the second deteriorated Mold identified by Pettelle, "Power of Presence 2011," is actually a large, life-size mold, from which he made a miniature version, entitled "Power of Presence (Mini)," which *is* a Mold. (*Id.* ¶ 18.) Caswell concedes the two molds Pettelle pointed out are indeed in poor condition, but maintains these molds were not included as collateral for the Note. (*Id.* ¶¶ 19, 20.) According to Caswell, "Power of Presence (Mini) . . . is in fine condition." (*Id.* ¶ 21.)

Contrary to her own inspector's testimony, Brooks later contended twenty-eight Molds, "and possibly others, were not delivered by defendants to Parks Bronze in compliance with the Settlement Agreement." (Pl.'s Resp. to Defs.' Second Set of Interrogs. at 4.) However, when asked what information caused her to believe the twenty-eight Molds had not been "delivered" to Parks Bronze, Brooks declined to answer, claiming the information fell under the attorney-client privilege.

(Brooks Dep. 153:18–25, 154:1–25.)

Caswell stated in December 2014: "[t]o the best of my knowledge, all of the [M]olds that were listed under the Security Agreement are at Parks Bronze." (First Caswell Decl. ¶ 5.) Around May 2015, Defendants asked Parks to conduct an inventory to determine whether all of the Molds, including the twenty-eight Molds Brooks had asserted were "not delivered," were in fact present at Parks Bronze. (Second Parks Decl. ¶ 5.) Though Parks initially had difficulty identifying all the Molds due to poor or erroneous labeling, after "work[ing] with Mr. Caswell," Parks located all but one portion of one of the Molds. (*Id.* ¶¶ 7, 8.) That Mold, entitled "Fighting Back," casts a sculpture depicting a cougar fighting with a ram. (*Id.* ¶ 8.) Only the Mold for the ram, not that for cougar, was located at Parks Bronze. (*Id.*) After this discovery, Caswell located the cougar Mold in his own foundry and shipped it to Parks Bronze. (*Id.*; Second Caswell Decl. ¶ 15.) Parks then re-labeled the Molds with their respective proper titles, (Second Parks Decl. ¶ 9,) and stated: "none of the [M]olds I looked at were damaged such that a [M]old could not be used to case a bronze sculpture," (First Parks Decl. ¶ 6.) In August 2015, Caswell testified he believed the only molds currently located in the shipping container were the Molds. (Caswell Dep. 44: 3–8.)

*Allegations*

In her complaint, Brooks alleges Defendants "never fully complied with the Agreement's requirement to transfer all the subject [M]olds to Parks Bronze" and "failed to ensure that the [M]olds are protected from the elements, deterioration, and theft." (Am. Compl. ¶ 22.) Five of Brooks's claims rely, at least in part, on these allegations. Most directly, her Third Claim for Relief, for breach of contract, alleges Defendant RCS breached its obligations under the Settlement Agreement and Note by failing both to make payments as specified in the Note and to move "all of

the collateral," the Molds, to Parks Bronze. (*Id.* ¶¶ 46–48.) Similarly, Brooks's Fifth Claim for Relief, for conversion, rests upon Defendants' purported failure to maintain the Molds, which Brooks contends "deprived [her] of the opportunity to possess the property." (*Id.* ¶ 62.) Additionally, though more attenuated, her First Claim, for fraud, and her Second Claim, for negligent misrepresentation, rely (though only in part) on allegations that Defendants falsely represented or negligently misrepresented RCS's intent to comply with the Settlement Agreement's requirements regarding the Molds. (*Id.* ¶¶ 37, 42.) Lastly, the Sixth Claim, for elder financial abuse, rests (again, only in part) upon her allegation Defendants wrongfully took Brooks's property and money via the misrepresentation and conversion of the Molds. (*Id.* ¶ 66.)

On August 21, 2015, Defendants filed their summary judgment motion, moving against the First, Second, Third, Fifth, and Sixth Claims for Relief to the extent they rely on allegations based upon missing or damaged Molds.

*Legal Standards*

Summary judgment is granted where the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2015). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint or with unsupported conjecture or

conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). Reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party is not absolute. A party asserting a fact cannot be true or is genuinely disputed must support that assertion with admissible evidence. FED. R. CIV. P. 56(c) (2015). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

*Discussion*

At essence, the claims attacked by Defendants' Motion rest on two factual premises. First, Brooks alleges not all of the Molds were available to her at Parks Bronze, contrary to the Settlement Agreement's requirements. Second, Brooks asserts some of the Molds have been damaged. Neither party disputes that for some period of time, one portion of the Mold "Fighting Back" was located

not at Parks Bronze but at Caswell's Troutdale foundry, contrary to the Settlement Agreement, but that at this time, all Molds are located within the shipping container at Parks Bronze. However, whether any of the Molds have in fact been damaged remains in contention, in large part due to purportedly conflicting testimony from Pettelle and Parks. With this background in mind, the court addresses the claims challenged in the Motion.

I. Third Claim for Relief: Breach of Contract

Though somewhat unclear from the complaint alone, in her response to the Motion, Brooks appears to allege Defendants breached the Settlement Agreement by failing to initially deliver the Molds to Parks Bronze by November 2011 or by removing at least some of the Molds from Parks Bronze after the delivery date. At hearing, Brooks also claimed the Molds were improperly labeled or were not all located in the same storage unit at the Parks Bronze facility and, therefore, were not "readily ascertainable" by her. Defendants move for summary judgment on grounds that all the Molds are currently located at Parks Bronze, as the Settlement Agreement requires. Defendants thus contend Brooks has not incurred any harm or damage as a result of Defendants' actions. Defendants further argue any breach on their part was immaterial, as Brooks was "not deprived of the benefit she reasonably expected." In response, Brooks argues it is not her burden to make beneficial use of Molds and that the extent of damages owed to her due to Defendants' breach is a question of fact for trial.

To state a viable claim for breach of contract in Oregon, a plaintiff must show the existence of a specific contract and its relevant terms, the plaintiff's full performance of the contract, defendants' breach of the contract, and resulting damages to the plaintiff. *Fleming v. Kids and Kin Head Start*, 71 Or. App. 718, 721 (1985). "In an action for breach of contract, the law attempts to

place the party injured by the breach in the position which he would have been in, if the other party had performed as nearly as that is possible, by means of a judgment for money." *Nelson Equip. Co. v. Harner*, 191 Or. 359, 369 (1951) (citing *Smith v. Pallay*, 130 Or. 282, 293 (1929)). In the event of a breach, plaintiff may recover for "losses caused or for profits and other gains prevented by the breach," so long as she can produce evidence sufficient to establish the value of these damages "with reasonable certainty." *Stubblefield v. Montgomery Ward & Co.*, 163 Or. 432, 447 (1939) (citing Restatement (First) of Contracts § 331 (1932)).

Under the Settlement Agreement, Defendants were expressly required only to "deliver the [M]olds to Parks Bronze . . . for storage . . . ." (Settlement Agreement at 12, ¶ 8(d).) Brooks contends this language implies an obligation not only to transfer the Molds to Parks Bronze, but also to label or index the Molds and to keep them within the specific storage unit in which they were transferred. The court finds no such implication in the Settlement Agreement. The operative language relied upon by Brooks to support her breach claim is brief, general, and does not impose upon Defendants a duty to deliver, store, or maintain the Molds by any specific means.

Brooks concedes that all the Molds are currently located at Parks Bronze, in full compliance of the Settlement Agreement. Therefore, Defendants have not breached the terms of the Settlement Agreement, with one minor exception: Defendants admit for some period of time, part of the "Fighting Back" Mold was not located at Parks Bronze. Even so, this exception is immaterial. A "material" breach is one that is "significant" or "essential," having "some logical connection with the consequential facts." BLACK'S LAW DICTIONARY 1066 (9th ed. 2009). The misplacement of one part of one Mold out of fifty-five total Molds has no connection or bearing on the consequential facts of this case, particularly given that Brooks never requested access to that specific, nor any other,

Mold. As such, this minor discrepancy alone cannot support Brooks's breach of contract claim.

Moreover, Brooks fails to prove this minor breach caused her to incur any damages. Proving damages with reasonable certainty requires more than just the market value of the property lost. *Willamette Quarries, Inc. v. Wodtli*, 308 Or. 406, 412 (1989). In *Willamette Quarries*, a plaintiff quarry and defendant landowner entered into a contract that granted the quarry the exclusive right to remove rock from the land and provided that no rock would be removed from the land without the written consent of the quarry. *Id.* at 408. Plaintiff later discovered rock had been removed and brought an action for breach of contract against the landowner. *Id.* at 409. To prove damages, plaintiff introduced evidence of the amount of rock taken from the subject land and the market price for such rock. *Id.* at 411. The trial court granted a directed verdict for defendants, and the court of appeals affirmed, holding the evidence was "insufficient to prove damages with reasonable certainty." *Id.* at 409, 411. The Oregon Supreme Court also affirmed, noting that although the landowner had indeed breached the contract, plaintiff had "adduced no evidence that any sales were hampered or lost because of the . . . breach." *Id.* at 412. Though evidence did show the plaintiff had made several unsuccessful bids for contracts calling for rock, the record also established "there was plenty of [] rock in the quarry to supply the plaintiff's possible future needs." *Id.* Thus, the evidence showed only what the defendant quarry "m[ight] have gained by way of the breach," not damages incurred by the plaintiff. *Id.*

Here, Brooks concedes she never attempted to access the Molds, let alone sell or profit by them in any way, until September 2014, two years after she was legally able to do so. Even after hiring Pettelle to inspect the Molds, Brooks did not request additional access to them for any reason. Though Brooks correctly points out she neither has nor had an obligation to make beneficial use of

the Molds, to recover damages she must prove with reasonable certainty that Defendants' breach either caused her losses or prevented gains. Brooks produced evidence of neither. Under *Willamette Quarries*, even if five Molds were missing from Parks Bronze for two years and the market value of the Molds could be accurately stated, Brooks still would have to show sales were hampered or contracts relying on the Molds were lost as a result of the missing Molds. No such evidence exists. Lastly, as *Nelson Equip. Co.* directs, the law's goal has been achieved here: Brooks, injured by the breach, finds herself in the position in which she would have been had all the Molds been at Parks Bronze all along. Because Brooks cannot sufficiently prove she incurred damages as a result of Defendants' breach, summary judgment for the breach of contract claim is granted.

II. Fifth Claim for Relief: Conversion

To support her conversion claim, Brooks alleges Defendants failed to "maintain" the Molds, which, she claims, deprived her of the ability to possess them. Based on Brooks's arguments at hearing, it appears this claim is premised upon only the allegations regarding damage to the Molds, not that any of the Molds were or are missing. Defendants move for summary judgment against the conversion claim, refuting Brooks's claim that the Molds are in fact damaged. Defendants next argue a secured party may recover for conversion only by first making a demand for the collateral at issue, and they cite for support *Davis v. F.W. Fin. Servs., Inc.*, 260 Or. App. 191, 208 (2013). Defendants note Brooks elected not to take possession of the Molds and, therefore, "repudiated her right to the [M]olds." Brooks counters that she was not required to use the collateral, that Defendants' interference with the Molds sufficiently supports her conversion claim, and that the mere fact Defendants eventually delivered (or returned) the Molds to Parks Bronze does not defeat the claim.

A *prima facie* claim of conversion requires a plaintiff prove an "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the full value of the chattel." *Mustola v. Toddy*, 253 Or. 658, 663 (1969) (adopting the definition of conversion found in Restatement (Second) of Torts §222A(1) (1965)). "A secured creditor with the right to possession of the collateral after default may maintain an action for conversion against one who has exercised unauthorized acts of dominion over the property to the exclusion of the creditor's rights." *Oregon Bank v. Fox*, 73 Or. App. 612, 615 (1985). However, a plaintiff may recover damages in an action for conversion only if the plaintiff can demonstrate she actually suffered injury. *Madden v. Condon Nat. Bank*, 76 Or. 363, 370 (1915).

Interference with another's property alone is not sufficient to amount to conversion; there need be intent to assert a right over the property. *Fogh v. McRill*, 153 Or. App. 159, 167 (1998). Even in the event of an actual, wrongful exercise of dominion over chattels, no conversion has occurred if such dominion is not a denial or repudiation of the owner's right or title. *Lee Tung v. Burkhart*, 59 Or. 194, 205 (1911) (where landlord removed tenant's property to storage; interference was not sufficient to support conversion).

In *Fogh*, a plaintiff and defendant lived together in a house where plaintiff kept camera equipment he bought and sold for income. *Fogh*, 153 Or. App. at 161–63. When their relationship turned abusive, defendant obtained a sixty-day temporary restraining order against the plaintiff, which gave plaintiff seventy-two hours to reclaim his camera inventory. *Id.* at 163. When he did not do so, defendant moved his belongings to a storage facility and soon after provided plaintiff the claim check for the unit. *Id.* Plaintiff left the equipment in the storage unit for four months before reclaiming it,

Page 13 - OPINION AND ORDER                                                                                                    *{AHS}*

then sued for conversion of the camera equipment. *Id.* Overturning the lower court's damage award for conversion, the Oregon Court of Appeals held although defendant did exercise dominion and control over the equipment, she did so for only a "short time." *Id.* at 167. Moreover, plaintiff "had the opportunity to recover his equipment during at least part of that time." *Id.* Further, defendant "did not interfere with [plaintiff]'s right of control beyond the short period that she exercised dominion or control over the equipment and, at most, her actions caused only minor physical harm to it." *Id.* Therefore, because plaintiff "did not intend to assert a right over the equipment inconsistent with [plaintiff]'s right of control," she was not liable for conversion. *Id.* at 167–68.

Under the summary judgment standard, Defendants hold the initial burden of establishing the absence of genuine issues of material fact, namely here, that the Molds are not in fact damaged. To do so, Defendants refer to a declaration of Steve Parks, submitted as an exhibit to Brooks's own opposition brief. Parks testified that based on his observations of the Molds during an inventory in April 2015, no Mold was damaged to the extent it could not have cast a sculpture. Brooks does not challenge the adequacy of Parks's qualifications to supply such testimony, a prudent course given that it was Brooks who introduced the declaration. With the Parks declaration, Defendants sufficiently establish the absence of a genuine issue of material fact regarding damage to the Molds, and the burden shifts to Brooks to identify facts beyond the pleadings that show a genuine issue for trial. Brooks's continued reliance on Pettelle, who conceded a "need to conduct additional testing, beyond a visual inspection" before he could determine whether any of the Molds were not in usable condition, does not meet this burden. Rather, the testimony resembles just the type of unsupported conjecture the summary judgment standard rejects.

Even if the Pettelle declaration did establish a genuine issue as to whether the Molds were

damaged, the record does not show evidence that Defendants possessed the intent required to support a conversion claim. Caswell maintains the portion of the "Fighting Back" Mold was located at his Troutdale foundry studio only accidentally. He testified he intended to surrender the Molds, in accordance with the terms of the Settlement Agreement, and believed he had lost access to them once RCS defaulted on the Note. Further, when Caswell learned Brooks believed five Molds were missing, he worked with Parks to locate the Molds. When he discovered a portion of the "Fighting Back" Mold was missing, he promptly located the part and sent it back to Parks Bronze.

The mere fact Caswell may have retained access to the Molds at Parks Bronze does not necessarily suggest Brooks was ever denied access to them, and no evidence of such exists. As in *Fogh*, even if Defendants did exercise dominion and control over any of the Molds, nothing in the record supports a reasonable inference they did so intending to assert a right over the Molds inconsistent with Brooks's ownership interest. This type of interference with the Molds does not constitute conversion. Moreover, as detailed with respect to the breach claim above, Brooks does not appear to have suffered any actual injury, which, under *Madden*, precludes recovery for conversion.

Under the summary judgment analysis, though evidence must be viewed in the light most favorable to the nonmoving party, this deference is of no consequence where no evidence supporting the nonmoving party's position exists. Even viewing the record in favor of Brooks, a rational trier of fact could not find Defendants liable for conversion. Therefore, summary judgment on the Fifth Claim for Relief is granted.

III. Remaining Claims: Fraud, Negligent Misrepresentation, and Elder Financial Abuse

Three of Brooks's remaining claims make mention of the allegations regarding missing or damaged Molds addressed above. The fraud and negligent misrepresentation claims, in relevant parts,

both allege Defendants falsely represented RCS's intent to comply with the Settlement Agreement's requirements regarding the Molds. To support her elder financial abuse claim, Brooks alleges Defendants wrongfully took her property and money via conversion of the Molds. Moving for summary judgment against these portions of the three claims, Defendants do not provide specific attacks, but merely assert their general arguments refuting that the Molds are missing or damaged. Similarly, Brooks does not specifically defend these claims, but her general allegations apply here as well.

To the extent the rulings above apply to Brooks's fraud, negligent misrepresentation, and elder financial abuse claims, the court so too grants summary judgment on the portions of these claims that rely on allegations of missing or damaged Molds.

## *Conclusion*

Defendants' Motion (ECF No. 95) for Partial Summary Judgment Re: Claim of Missing Molds is GRANTED.

DATED this 14th day of March, 2016.

JOHN V. ACOSTA
United States Magistrate Judge