UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


GRETCHEN BROOKS, an individual,

                     Plaintiff,

     v.

HARLON RIP CASWELL, an individual,
RIP CASWELL SCULPTURES, INC., an
Oregon corporation d/b/a CASWELL
GALLERY, an Oregon assumed business
name, CASWELL PROPERTIES, INC.,
a Washington limited liability company,
and DOES 1-5,

                     Defendants.

_____

Case No.: 3:14-cv-1232-AC

OPINION AND ORDER


ACOSTA, Magistrate Judge:

*Introduction*

     Plaintiff Gretchen Brooks ("Brooks") filed this action against defendants Harlon Rip Caswell

("Caswell"), Rip Caswell Sculptures, Inc., dba Caswell Gallery ("Caswell Sculptures"), and Caswell Properties, LLC ("Caswell Properties")(collectively "Defendants") seeking damages related to Defendants' alleged wrongful conduct with regard to the settlement of a prior lawsuit. Currently before the court is Defendants' motion (ECF No. 143) for summary judgment on Brooks's First Claim for Relief for fraud; Second Claim for Relief for negligent misrepresentation, Fourth Claim for Relief for breach of the duty of good faith and fair dealing, and Sixth Claim for Relief for conversion. Defendants also move (ECF No. 166) to strike the declaration of Robert Koenke, filed by Brooks for the purpose of establishing the present value of collateral on which Brooks foreclosed.

The court finds Brooks has failed to establish Defendants made any false representations with regard to their duty to pay or the value of the collateral, a breach of the statutory duty of good faith with regard to terms of the settlement documents, or improper motive at the time of negotiation and execution of the settlement agreement. Consequently, Defendants' motion for summary judgment is[1] granted. Defendants' motion to strike the Koenke is denied as moot.

*Preliminary Evidentiary Matter*

Defendants move to strike the declaration of Robert Koenke for failure to satisfy the requirements for admissibility under FED. R. EVID. 702. The court has resolved the issues raised in Defendants' motion for summary judgment without relying on, or even considering, the evidence offered in the Koenke Declaration. Accordingly, the Koenke Declaration is irrelevant and Defendants' motion to strike the declaration is denied as moot.

---

[1] The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

*Background*

From 2006 to 2009, Brooks advanced more than $5,000,000 to Caswell Sculptures and Caswell Properties to facilitate development of Caswell's sculpture business. (Hahs Decl. dated December 10, 2014, ECF No. 16 ("Hahs 2014 Decl."), Ex. A at 1; Seidl Decl. dated May 9, 2016, ECF No. 144 ("Seidl May Decl."), Ex. 1 at 9-11. ) Brooks was extremely knowledgeable about Caswell's art, the largest collector of his work at one time, and very involved in the marketing of his sculptures during the period she funded Caswell's business. (Honore Decl. dated July 15, 2016, ECF No. 160 ("Honore Decl."), Ex. 12 at 3.) In fact, an entity hired by Caswell Sculptures to evaluate the business in March 2009 referred to Brooks as an "activist investor who is operating as de facto CEO [who] sets the company's current strategic direction and essentially controls day-to-day operations." (Seidl Decl. dated August 11, 2016, ECF No. 144 ("Seidl August Decl."), Ex. 6 at 2.) The parties ended the business relationship in late 2009, and Brooks demanded repayment of her investment. (Hahs 2014 Decl. Ex. A, at 1. ) Defendants refused, denying the loans were then due and payable. (Hahs 2014 Decl. Ex. A, at 1.)

I.  Brooks Lititgation

Brooks filed a lawsuit in state court in January 2010, seeking recovery of her advances and alleging breach of implied and express contract, money had and received, fraud, misrepresentation, and claim and delivery (the "Brooks Litigation"). (Hahs 2014 Decl. Ex. A, at 1. ) Brooks expressly alleged Caswell made fraudulent representations regarding his business operations and monthly sales to induce Brooks to provide additional funding, and asserted Caswell breached a promise to personally assume liability for repayment of the funds advanced to Caswell Sculptures and Caswell Properties. (Seidl May Decl. Ex. 1 at 5-7.) Brooks alleged she was entitled to the assets of Caswell

Sculptures and Caswell Properties as security for repayment of the advances, and Caswell failed to deliver the assets on demand and created liens on the assets in favor of other parties. (Seidl May Decl. Ex. 1 at 6-7.)

In an opinion addressing the parties' numerous motions, including cross-motions for summary judgment, the state court characterized the transfer of the money from Brooks to Defendants as a "loan" but found the terms of the oral agreement to be ambiguous. (Seidl May Decl. Ex. 4 at 1-3.) In light of the existence of an enforceable contract[2] between the parties, the state court found no claim for unjust enrichment existed. (Seidl May Decl. Ex. 4 at 4.) The court dismissed Brooks's claim for fraud based on the absence of evidence of reasonable reliance on the alleged false representations, but denied summary judgment on Defendants' counterclaim for fraud based on Brooks's representations the debt would be payably only if and when the parties business plan proved successful. (Seidl May Decl. Ex. 4 at 5.) Finally, the court denied Brooks's motion for summary judgment on Defendants' claims for intentional infliction of emotional distress and lender liability, and granted Defendants' motion for leave to amend to allege punitive damages. (Seidl May Decl. Ex. 4 at 5-7.)

On May 31, 2011, a jury returned a verdict in the Brooks Litigation, finding Brooks loaned money to Caswell Sculptures in return for a conditional promise to repay the loans when profits were generated, but that such loans were not yet payable and did not have a specific pay-off deadline. (Seidl May Decl. Ex. 2 at 1-3.) Additionally, the verdict noted Defendants breached the contract with regard to prepaid deposits for artwork and granted Brooks a credit of $109,800 on Caswell's

---

[2]The parties admitted the existence of an enforceable contract between Brooks and Caswell. (Seidl May Decl. Ex. 4 at 4.)

artwork at a 33% discount. (Seidl May Decl. Ex. 2 at 3.) On Defendants' counterclaims, the jury found Brooks and Defendants entered into a partnership and Brooks breached her fiduciary duties to Defendants, with resulting damages of $1,638,519.10. (Seidl May Decl. Ex. 2 at 5.) It also found Brooks breached an oral loan agreement to Caswell Sculptures resulting in damages of $852,506.90. (Seidl May Decl. Ex. 2 at 7.) With regard to Defendants' claim for punitive damages, the jury requested the following be read into the record:

> This jury would like to read into the record that the actions of Gretchen Brooks which led to our finding that a partnership existed and a breach of fiduciary duties within the partnership occurred that those types of actions are not an acceptable way of doing business in Oregon. However, we cannot find that her actions met the standard to award punitive damages.

(Seidl May Decl. Ex. 5.)

## II. Ferris Litigation

In July 2011, Defendants filed an action against Kimball H. Ferris, the attorney representing Defendants from October 2005 through November 2009 (the "Ferris Litigation"). (Hahs 2014 Decl. Ex. A at 4.) Defendants alleged claims for legal malpractice, negligence, and breach of fiduciary duty based on conduct during, and failure to properly document, the funding arrangement between Brooks and Defendants which resulted in the Brooks Litigation, and sought damages relating to the liabilities incurred by Defendants in connection with the Brooks Litigation. (Hahs 2014 Decl. Ex. A at 4.)

## III. Settlement Agreement

In August, 2011, Brooks initiated settlement discussions with Defendants to resolve complicated issues remaining after the trial that were to be decided by the court. (Seidl May Decl. Ex. 6 at 1; Hahs 2014 Decl. ¶ 4; Hahs Decl. dated February 23, 2015, ECF No. 31 ("Hahs 2015

Decl."), ¶ 9.)  These issues included the manner of liquidating Caswell Sculptures's inventory by a professional receiver appointed during the litigation, as well as the separation of partnership and individual assets.  (Hahs 2015 Decl. ¶¶ 10-11.)  Caswell formed a new entity, Caswell Studios, Inc. ("Caswell Studios"), to which work-in-progress and other assets identified as belonging to Caswell would be transferred.  (Hahs 2015 Decl. ¶11.)

The morning of August 29, 2011, Brooks presented a lengthy and complex settlement proposal to Defendants, and negotiations occurred on August 29th and 30th.  (Hahs 2015 Decl. ¶¶ 12, 15.)  Brooks's proposal included a promissory note from Caswell Studios to Brooks in the amount of $850,000 payable in graduated payments over a seven-year term with interest accruing at a rate of four per cent per annum.  (Hahs 2015 Decl. Ex. 13 at 4.)  Caswell objected to the identification of Caswell's new entity, rather than Caswell Sculptures, as the maker of the note based on Caswell's desire to keep a bright line between his new and old corporations.  (Monson Dep. dated February 18, 2015 ("Monson Dep.") 59:3-17.)  He also refused to be personally liable on the note, but suggested the note be secured solely by identified collateral.  (Monson Dep. 59:3-17.)  Caswell also requested a decrease in the note from $850,000 to $650,000.  (Brooks Dep. dated July 2, 2015 ("First Brooks Dep.") 41:1-422.)

Brooks agreed to Caswell's demands based, in part, on assurances from an unidentified source Caswell Sculptures would pay the note if the principal was reduced.  (Monson Dep. 59:3-20; First Brooks Dep. 41:1-44:5, 48:0-49:4.)  Specifically with regard to the lack of a personal guaranty, Brooks's counsel perceived Caswell did not have any assets so Brooks was not giving up anything of substance.  (Walker Dep. dated February 16, 2015 ("Walker Dep.") 77:25-78:6.)

The parties executed the Settlement Agreement and Mutual Release on September 21, 2011

(the "Agreement"). (Hahs 2014 Decl. Ex. A.) Defendants were entitled to retain rights to work-in-progress; intangible assets; specified furniture, equipment, and accounts receivable; fifty percent of the amount remaining the receiver account after payment of all creditor claims; and "all existing molds, intellectual property, and reproduction rights (subject to Brooks' security interests in certain molds and associated rights under the Brooks Security Agreement as discussed in Paragraph 8(c) below)." (Hahs 2014 Decl. Ex. A, at 6.) Brooks received identified sculptures in consideration for her pre-paid deposits; title to real property located in Troutdale, Oregon, used by Defendants as a gallery; new office furniture; specified office equipment and electronics; a promissory note in the amount of $650,000; $50,000 in cash; twenty-five percent of any net recovery in the Ferris Litigation; fifty percent of the amount remaining the receiver account after payment of all creditor claims; and certain artwork inventory remaining after payment of creditor claims. (Hahs 2014 Decl. Ex. A, at 6-7.) These items "represent the total amount of consideration that will be given or received by the Parties in the connection with the Brooks Lawsuit to resolve finally the Disputed Claims and Released Claims." (Hahs 2014 Decl. Ex. A, at 7.) The parties agreed to dismiss any remaining claims in the Brooks Litigation with prejudice within seven days of transfer of the Troutdale gallery from Defendants to Brooks. (Hahs 2014 Decl. Ex. A, at 5.)

With regard to the $650,000 promissory note from Caswell Sculptures to Brooks (the "Note"), the Agreement deferred payments until March 1, 2012, when minimum monthly payments of $2,500 became due for three consecutive months. (Hahs 2014 Decl. Ex. A, at 10.) In June 2012, the minimum monthly payments increased to $4,000 for a year, with reamortization of the Note in July 2013, to ensure payment in full by the end of the seven-year term. (Hahs 2014 Decl. Ex. A, at 10.) Brooks agreed to the payment schedule in response to Caswell's desire to not make a promise

he could not keep or to immediately default on the Note. (Walker Dep. 73:23-74:7.) The schedule was intended to allow Caswell a chance to "get on his feet with the new business." (Walker Dep. 73:23-74:7.) In the event of default, Brooks would provide written notice of such default and provide Caswell Sculptures no less than fifteen days to cure such default before enforcing her rights under the security agreement. (Hahs 2014 Decl. Ex. A, at 10.) The sole remedy for such default was to foreclose on and take possession of the collateral for the Note. (Hahs 2014 Decl. Ex. A, at 10-11.)

The collateral was identified as fifty-five sculpture molds listed in an attached exhibit (the "Molds"); the rights to reproduction associated with the Molds, transfer the Molds and sculptures cast therefrom, create derivative works such a miniatures or enlargements of the Molds, and display sculptures cast from the Molds publicly, as well as all net proceeds derived from sales of sculptures cast from the Molds. (Hahs 2014 Decl. Ex. A, at 11-12.) However, until Brooks foreclosed on her security interest in the Molds, Defendants retained the right to cast and sell sculptures from the Molds to third parties on commercially reasonable terms with the net proceeds from the sale of any such sculpture paid to Brooks. (Hahs 2014 Decl. Ex. A, at 13.) Any funds received by Brooks for such sales would be credited to Caswell Sculptures as a payment on the Note. (Hahs 2014 Decl. Ex. A, at 13.) The Molds were to be delivered to Parks Bronze ("Parks") by November 16, 2011, for storage and remain there until the Note was satisfied or Brooks enforced her rights under the Agreement following a payment default. (Hahs 2014 Decl. Ex. A, at 12.)

In return for valuable consideration, identified as the $50,000 payment, the Note, and title to the Troutdale gallery, Brooks released Defendants:

> from any and all claims, rights demands, actions, causes of action, suits, damages, liabilities, costs, expenses, and losses of any kind or character whatsoever, whether presently known or unknown, asserted or unasserted, contingent or noncontingent,

that any of the Brooks Releasors have, may have had, or may claim to have against
any of the Defendant Releasees for any "**Released Claim**," defined as any claim
arising from or related to acts, events, or omissions by any Party occurring on or
before the Effective Date of this Agreement, including but not limited to, the
Disputed Claims and all claims of any kind that could have been alleged by or on
behalf of any Party.

(Hahs 2014 Decl. Ex. A, at 20.)  The parties further acknowledged:

that they may hereafter discover facts in addition to or different from those which
they now believe to be true with respect to the subject matter released herein, but
agree that they have taken that possibility into account in reaching this Agreement
and that, notwithstanding the discovery or existence of any such additional or
different facts, as to which they expressly assume the risk, and in consideration for
the mutual covenants, promises, and releases set forth in this Agreement, they fully,
finally, and forever settle and release any and all such claims, known or unknown,
suspected or unsuspected, contingent, or non-contingent, whether or not concealed
or hidden, which now exist, or heretofore have existed upon any theory of law or
equity, including but not limited to conduct which is negligent, intentional, with or
without malice, or a breach of any duty, law, or rule, without regard to the subsequent
discovery or existence of such different or additional facts.

(Hahs 2014 Decl. Ex. A, at 21.)  However, the Agreement did not "affect, inhibit, or limit" a party's

right to assert claims for conduct arising after the signing of the Agreement, specifically including

Brooks's right to enforce the Agreement or her security interests in the Molds, or allege claims for

breach of the Agreement.  (Hahs 2014 Decl. Ex. A, at 21.)

Pursuant to the terms of the Agreement, Caswell executed the Note, identified as a Non-

Recourse Promissory Note, as President of Caswell Sculptures.  (Hahs 2014 Decl. Ex. B.)  The Note

included the payment terms set forth in the Agreement and acknowledged the Note was secured by

a security interest in the Molds and related reproduction rights.  (Hahs 2014 Decl. Ex. B at 1.)  The

Note specifically provided it is:

NON-RECOURSE against RCS, its officers, directors, shareholders or employees,
except for the collateral specified in the Settlement Agreement, and claims arising
from breach of the Settlement Agreement as set forth therein.  Brooks shall look only

to such collateral for satisfaction and payment of any sums due under the terms of
this note in the event of any default by RCS.

(Hahs 2014 Decl. Ex. B at 2.)  Caswell included the Note in his damage calculation for settlement

purposes in the Ferris Litigation.  (Honore Decl. Ex. 5, at 3.)

Brooks and Caswell also executed a security agreement governing Brooks's security interest

and rights in the Molds (the "Security Agreement").  (Hahs 2014 Decl. Ex. C.)  Under the terms of

the Security Agreement, Caswell would be considered in default of the Security Agreement if "[a]ny

warranty, representation, or statement made or furnished to [Brooks] by or on behalf of [Caswell]

under the agreement, or the Settlement Agreement proves to have been false in any material respect

when made or furnished."  (Hahs 2014 Decl. Ex. A at 3.)  To the extent of any conflict between the

Note, the Security Agreement, and the Agreement, the Agreement controlled.  (Hahs 2014 Decl. Ex.

A, at 11, 13; Ex. B at 1; Ex. C at 1.)

Caswell did not promise to make all payments, or a specific number of payments, due under

the Note before taking advantage of the sole remedy of transferring title and possession to the Molds

to Brooks.  (Monson Dep. 57:8-58:3.)  Moreover, Brooks, who was sixty-five years old at the time

she signed the Agreement, knew her sole recourse upon default of the Note was to foreclose upon

the Molds.  (Brooks Dep. dated July 10, 2015 ("Second Brooks Dep.") 237:22-238:4, 238:10-15;

(Brooks Decl. dated July 15, 2016, ECF No. 161 ("Brooks Decl."), ¶ 9.)  Brooks admits she has no

knowledge of Caswell representing the value of the Molds during settlement negotiations and, in

fact, was not present during the settlement discussions.  (First Brooks Dep. 31:9-8; 32:6-9; 125:5-

10.)  However, through her experience with Caswell, she "believed he assigned significant value to

these molds and would not want to lose them."  (Brooks Decl. ¶ 11.)

In negotiating the Agreement with Caswell, Brooks acknowledged she was dealing with someone who she believed had fraudulently induced her to enter into the prior loan arrangement. (First Brooks Dep. 23:2-5.)  In a deposition taken for the Ferris Litigation, Brooks testified Caswell has a habit of lying, his reputation for truthfulness in the art community is "horrific," he is not noted for his truthfulness, and is not highly valued or regarded.  ((Brooks Dep. in Ferris Litigation dated June 28, 2012 ("Brooks Ferris Dep.") 90:24-91:9.)  Nevertheless, because Brooks and Caswell were both represented by counsel, the jury determined Brooks was obligated to repay Caswell for the loans, and Caswell was obligated to pay Brooks when he sold sculptures cast from the Molds, Brooks believed Caswell would fulfill his contractual obligations to her.  (Brooks Decl. ¶¶ 12-14.)

IV.  Default on Note

On August 3, 2012, Brooks emailed a notice of default on the Note to Defendants.  (Hahs 2014 Decl. Ex. D.)  Brooks indicated Caswell Sculptures had not paid the $4,000 due under the Note on August 2, 2012.  (Hahs 2014 Decl. Ex. D.)  Brooks also noted she had not received required copies of invoices for the casting of sculptures from the Molds since February 2012.  (Hahs 2014 Decl. Ex. D.) In response, Defendants advised Brooks that Caswell Sculptures would not be making the August payment and Brooks was free to exercise her rights to the Molds.  (Hahs 2014 Decl. Ex. E at 1.)  Caswell elected to default on the Note and surrender the Molds based on the less than expected settlement of the Ferris Litigation and the desire to invest his money in his new business,[3] despite reported profits for Caswell Studios in 2011 and through May 2012.  (Caswell Dep. dated May 15, 2012 ("First Caswell Dep.") 238:25-239:21; Second Caswell Dep. 8:23-9:9.)  Additionally,

---

[3]Caswell bought a foundry and property on which he intended to build a larger gallery building after he settled the Ferris Litigation.  (Caswell Dep. dated August 19, 2015 ("Second Caswell Dep.") 86:1-25)

Defendants informed Brooks no new orders of sculptures made from the Molds had been received since February 2012.  (Hahs 2014 Decl. Ex. E at 1.)

In September 2012, the parties discussed the transfer of possession of the Molds to Brooks, who had yet to decide how, when, or where to transfer the Molds.  (Hahs 2014 Decl. ¶ 13.)  On October 4, 2012, Defendants informed Brooks of Caswell's intent to move sculpture molds he owned from Parks, where they were stored with the Molds, to another location.  (Hahs 2014 Decl. Ex. F.)  Caswell would leave the Molds securing the Note at Parks and recommended Brooks contact Parks to arrange payment for future storage fees relating to the Molds.  (Hahs 2014 Decl. Ex. F.)

Brooks's counsel, Laura Walker ("Walker"), indicated she was not sure if Brooks even wanted the Molds and suggested Caswell make Brooks an offer to purchase the Molds.  (Second Caswell Dep. 80:15-20; Hahs Dep. dated April 17, 2015 ("Hahs Dep.") 50:8-12.)  Andrew Hahs, Caswell's legal counsel ("Hahs") responded:

> Rip has received no interest in castings from the molds in which Gretchen has the security interest and he believes they have little value.  However, as a one-time offer, Rip is willing to pay Gretchen $10,000 to release her security interest in all the molds.  Let me know in the next seven days if she is interested in this offer.  If not, Rip will proceed to unload the molds and leave them at Parks.  We can then finalize the surrender agreement.

(Hahs 2014 Decl. Ex. F at 1.)  It was this offer and response that led Brooks to believe Caswell never intended to pay the Note.  (Seidl May Decl. Ex. 18, at 2.)

This $10,000 offer was the amount Caswell could afford to pay Brooks at that time.  (Honore Decl. Ex. 12 at 2.)  He later opined the total retail value of the sculptures that could be cast from the Molds was more than $24,000,000.  (Honore Decl. Ex. 12, at 2.)  According to Caswell, the transfer of the Troutdale gallery to Brooks, along with her intimate knowledge of and experience

marketing Caswell's art, and her financial resources positioned Brooks to capitalize on the market value of the Molds.  (Honore Decl. Ex. 12, at 3.)

In January 2013, Brooks drafted a collateral surrender agreement detailing the transfer of the Molds and forwarded the draft to Defendants in February 2013.  (Hahs 2014 Decl. ¶¶ 16, 17.) Defendants returned the draft to Brooks with requested changes, including a demand the surrender agreement include a release of liability.  (Hahs 2014 Decl. ¶ 17; Walker Decl. dated July 14, 2016, ECF No. 163 ("Walker Decl.") ¶ 4.)  Brooks was unwilling to release Defendants from liability under the Note before having the opportunity to inspect the Molds and Caswell was unwilling to allow Brooks access to the Molds until a collateral surrender agreement releasing Defendants from liability had been signed.  (Walker Decl. ¶ 4; Brooks Decl. ¶20.)

In April 2013, after hearing nothing more about the Molds from Brooks, Defendants contacted Brooks to reiterate their offer to purchase the Molds and discuss the transfer of possession of the Molds.  (Hahs 2014 Decl. ¶ 18.)  Brooks formally rejected the offer on April 8, 2013, and advised Defendants she intended to take possession of the Molds at a later date.  (Hahs 2014 Decl. ¶ 19, Ex. H.)  The Molds remain at Parks and were fully accounted for as of October 27, 2015. (Honore Decl. Ex. 14 at 3.)

 In July and September of 2014, two prospective customers contacted Caswell Studios inquiring about purchasing castings from the Molds.  (Honore Decl. Ex 11 at 1, 3.)  Caswell's employee advised them such castings were entirely sold out or "cast out," and no longer available. (Second Caswell Dep. 96:6-15; Honore Decl. Ex 11 at 1, 3.)  At that time, Caswell had already surrendered the Molds to Brooks, did not have the rights to use the Molds, and did not want to represent he had the ability to cast from the Molds.  (Second Caswell Dep. 34:14-20, 92:306, 93:17-

25.)  However, he did not instruct his employee on how to handle such calls.  (Toynbee Dep. dated April 21, 2015, ("Toynbee Dep.") 26:8-10.)  Additionally, in June 2016, the website for Caswell Sculptures listed statutes cast from the Mold as "sold out," and recommended contacting Caswell Sculptures for secondary market availability.  (Honore Decl. Ex. 13.)

<u>V. Current Litigation</u>

Brooks filed this lawsuit on July 31, 2014, asserting claims for fraud, negligent misrepresentation, breach of contract, breach of the duty of good faith and fair dealing, conversion, and elder financial abuse based on allegations Caswell never intended to pay the Note and entered into the Agreement for the sole purpose of obtaining Brooks's cooperation in the Ferris Litigation. Brooks filed a First Amended Complaint on June 30, 2015, alleging the same claims but including additional factual support (the "Complaint").  Defendants move for summary judgment on Brooks's First Claim for Relief for fraud, Second Claim for Relief for negligent misrepresentation, and Fourth Claim for Relief for breach of the duty of good faith and fair dealing.

*Preliminary Procedural Matter*

Defendants contend the court's ruling on Defendants' motion for partial summary judgment regarding the Molds resolved the claims alleged in Brooks's Fifth Claim for Relief for conversion and Sixth Claim for Relief for elder financial abuse.  Defendants also assert this ruling, viewed in conjunction with Brooks's partial dismissal[4] of her Third Claim for Relief for breach of contract, effectively disposes of this claim as well.

At oral argument, Brooks conceded her Third Claim for Relief for breach of contract is no

---

[4]On July 16, 2015, Brooks partially dismissed her Third Claim for Relief to the extent it relied on OR. REV. STAT. 72.7190.  (Notice of Limited Partial Dismissal of Pl.'s Third Claim for Relief, ECF No. 83.)

longer at issue.  Additionally, Brooks does not dispute Defendants' contention with regard to her

Fifth Claim for Relief for conversion.   However, Brooks does argue a portion of her Sixth Claim

for Relief for elder financial abuse survived Defendants' motion for partial summary judgment and

is properly before the court.

      In her Sixth Claim for Relief, Brooks alleges "Defendants wrongfully took [her] property and

money via misrepresentation and conversion."  (Am. Compl. ¶ 66.)  In addressing Defendants'

motion for partial summary judgment, the court found Defendants adequately maintained the Molds

prior to delivering possession of them to Brooks.  *Brooks v. Caswell*, Case No. 3:14-cv-01232-AC,

2016 WL 1056977, at *6 (D. Or. March 14, 2016).  Consequently, the court granted Defendants

summary judgment on Brooks's Fifth Claim for Relief for conversion.  *Id*. at *7.  Additionally, the

court applied this ruling to Brooks's elder financial abuse claim, thereby defeating Brooks's Sixth

Claim for Relief to the extent it relies on missing or damaged Molds or her claim of conversion.

*Brooks*, 2016 WL 1056977, at *7.  However, Brooks's elder abuse claim based on the wrongful

taking of money by misrepresentation remains at issue, has been briefed by the parties, and is

addressed in this Opinion.

## *Legal Standard*

      Summary judgment is appropriate where  the "movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a) (2016).  Summary judgment is not proper if material factual issues exist for trial.  *Warren v.*

*City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

      The moving party has the burden of establishing the absence of a genuine issue of material

fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of

a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2013). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I.  First Claim for Relief – Fraud

In support of her First Claim for Relief, Brooks alleges "Defendants falsely represented RCS'

intent to pay on the Note, falsely represented RCS' intent to comply with the Agreement's

requirements regarding the molds, and falsely represented the value of the molds to Caswell, in order

to induce Brooks to sign the Agreement, and to provide releases of indebtedness therein." (Am.

Compl. ¶ 37.)    The court has already determined Defendants materially complied with the

Agreements requirements regarding the Molds defeating any claim for false representation related

thereto.  *Brooks*, 2016 WL WL 1056977, at *5.  Accordingly, Brooks's remaining claims relate

solely to a promise to pay the Note and representations relating to the value of the Molds.

Defendants move for summary judgment on Brooks's fraud claim arguing Brooks has failed

to offer the requisite evidence to establish the *prima facie* elements of the claim.  Alternatively,

Defendants argue Brooks released her claim for fraud in the Agreement and elected to affirm the

Agreement.

In Oregon, the *prima facie* elements of a common-law fraud claim are: (1) a representation;

(2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth;

(5) the speaker's intent the representation should be acted upon by the listener in the manner

reasonably contemplated; (6) the listener's ignorance of the representation's falsity; (7) the listener's

reliance on the truth of the representation; (8) the listener's right to rely thereon; and (9) the listener's

consequent and proximate injury.  *Webb v. Clark*, 274 Or. 387, 391 (1976)(en banc)(citations

omitted).  "If any one of these elements is not established by clear and convincing evidence,

plaintiff's case must fail." *Id*.  "Clear and convincing evidence means that the truth of the facts

asserted is highly probable." *Coy v. Starling*, 53 Or. App. 76, 80 (1981)(citations omitted).

    *A.  Value of Molds*

    Brooks is unable to identify any representations made by or on behalf of Defendants relating to the value of the Molds prior to the execution of the Agreement.  In fact, Brooks admits she has no knowledge of Defendants valuing the Molds during settlement discussions but, through her experience with Caswell, "believed he assigned significant value to the Molds and would not want to lose them." (Brooks Decl. ¶ 11.)  Brooks's assumption with regard to the value Caswell assigned the Molds was entirely subjective and not based on any evidence in the record.  Brooks, who was intimately involved with the management of Caswell Sculptures, had personal knowledge of the value of the Molds and could have had the Molds appraised if she was concerned the Molds would not provide sufficient collateral for the Note.  In the absence of any representation on this primary issue and in light of Brooks's independent knowledge of the Molds, Brooks's fraud claim based on improper valuation of the Molds fails.

    The two representations Brooks refers to in her opposition brief with regard to the value of the Molds were Caswell's offer of $10,000 for the Molds, and his subsequent valuation of the sculptures able to be cast from the Molds at more than $24,000,000.  However, these representations occurred in October 2012 and February 2015 respectively, well after the Agreement was signed in September 2011.  Brooks could not have relied on these two statements in signing the Agreement, and her fraud claim thus fails on this ground.

    *B.  Promise to Pay*

    During the settlement negotiations, Caswell requested a reduction in the amount of the Note, a deferral in monthly payments, and a gradual increase in the required monthly payments to

accommodate Caswell's desire to avoid making promises he could not keep. Brooks's counsel represented the payment schedule was intended to provide Caswell a chance to have some success in his new business before assuming an obligation to make monthly payments. Brooks agreed to these concessions based on representations from an unidentified source Caswell would pay the Note. However, there is no evidence in the record Caswell make any promise to make all, or a specific number of, payments due under the Note before defaulting.

Again, Brooks has failed to present evidence of a representation by Defendants they would pay the Note in full. Rather, Defendants negotiated a non-recourse note relieving Defendants, and specifically Caswell, of an obligation to pay the Note in full. The sole promise to pay appears to have been relayed to Brooks by her counsel in a summary of the settlement negotiations, without any identification of who made such promise. Brooks acknowledged her sole recourse, in the event of a default on the Note, was to foreclose upon the Molds, inherently conceding the possibility of a default. A reasonable trier of fact could not find a false representation made by Defendants to Brooks based on these facts.

Even assuming Defendants represented an intent to pay the Note in full, Brooks is unable to establish such representation was false when made. "Where [an] alleged misrepresentation is based upon a promise to perform some future act, a plaintiff must establish that the speaker did not intend to perform the promised act when the statement was made, or that the statement was made with reckless disregard as to whether the act would be performed." *Araujo v. General Elec. Info. Servs.*, 82 F. Supp. 2d 1161, 1170 (D. Or. 2000)(applying Oregon law).

The evidence presented supports a finding Defendants intended to pay the Note at the time they made such representation. Defendants asked for changes to the Note to avoid making a promise

they could not keep or an immediate default on the Note. Brooks was aware Defendants were starting over in business and needed time to establish their new venture. Additionally, Defendants were relying on the possibility of a large award of damages in the Ferris Litigation to help pay the Note and elected to default on the Note only after they knew they would receive less than expected from the Ferris Litigation. Furthermore, Defendants made a few payments on the Note before advising Brooks of their decision to default on the Note, an act inconsistent with an intent to not pay the Note. Brooks has failed to establish a question of fact, by clear and convincing evidence, that at the time Defendants promised to pay the Note, they did not intend to keep the promise or made such a promise with reckless disregard for whether or not they could pay.

Brooks argues Defendants' financial status at the time of the default is evidence Defendants never intended to pay off the Note. Brooks then questions if Defendants refused make payments on the Note at a time when they had the ability to do so, under what circumstances would they have made such payments? "A fraudulent intent not to perform a promise may not be inferred as existing at the time the promise is made from the mere fact of nonperformance. Other circumstances of a substantial character must be shown in addition to nonperformance before such inference of wrongful intent may be drawn." *Conzelman v. Nw. Poultry & Dairy Prods. Co.*, 190 Or. 332, 352 (1950).

Brooks does not present specific evidence of Defendants' financial status at the time of default but merely refers to the settlement of the Ferris Litigation, a payment for a commissioned work, and the purchase of a new foundry as evidence establishing Defendants had the ability to pay the Note. The parties clearly contemplated Defendants would be entitled to continue business operations and, in fact, relied on the success of such business to make the monthly payments under

the Note.  The purchase of a foundry and the receipt of commissions furthers the business and that purpose.  While the business was profitable in 2011 and early 2012, there is no evidence of the degree of such profitability.  Moreover, Defendants apparently earmarked the funds from the settlement of the Ferris Litigation for specific needs and debts, such as Brooks and legal counsel, and, upon discovering the settlement could not cover all the identified items, elected to default on the Note.  Defendants' receipt of the settlement funds and commission payments, and purchase of a foundry are not circumstances of a substantial character establishing Defendants never intended to pay the Note.

### C.  Conclusion

Brooks has failed to establish with clear and convincing evidence Defendants made any representations regarding the value of the Molds or Defendants intent to pay the Note that were false at the time they were made.  Defendants are entitled to summary judgment on Brooks's First Claim for Relief for fraud.  Defendants' alternative arguments based on Brooks's release of her fraud claim and affirmation of the Agreement are moot and need not be addressed.

## II.  Second Claim for Relief – Negligent Misrepresentation

Brooks relies on the same representations in support of her negligent misrepresentation claim as she did in support of her fraud claim: Defendants' intent to pay the Note and the value of the Molds.  Under Oregon law, a defendant may be liable for economic loss sustained by others who rely on the defendant's negligent misrepresentations.  *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or. 149, 159 (1992).  This court has found Defendants did not make any misrepresentations, either intentional or negligent, with regard to their intent to pay the Note or the value of the Molds.  For

the reasons discussed above, Brooks's Second Claim for Relief fails.[5]

III.  Fourth Claim for Relief – Duty of Good Faith and Fair Dealing

In her Fourth Claim for Relief, Brooks alleges Caswell Sculptures breached the duty of good faith and fair dealing by failing to make reasonable efforts to pay the Note and by failing to produce additional copies of old sculptures.  Brooks relies on the common law implied duty of good faith and fair dealing with regard to the Agreement and the statutory duty of good faith imposed by OR. REV. STAT. 71.3040 with regard to the Note and Security Agreement.  Defendants move for summary judgment on this claim asserting the alleged obligations improperly extend the terms of the Agreement, Security Agreement, and Note.

*A. Applicable Standard*

Defendants argue the Agreement is a secured transaction subject to the Uniform Commercial Code (the "Code").  Brooks alleges: "[t]he Agreement carries an implied duty of good faith and fair dealing."  (Am. Compl. ¶ 54.)  Chapter 9 of the UCC applies to a "transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract."  OR. REV. STAT. 79.0109 (2016).  The Agreement describes the terms of the Note and provides it "shall be secured by a lien on certain molds and associated rights discussed below."  (Hahs 2014 Decl. Ex. A at 11.)  The Agreement creates a security interest in the Molds and is subject to the UCC.  The parties agree the Note and Security Agreement are subject to the UCC.  The statutory duty of good faith found in the UCC displaces the common law implied duty of good faith and fair dealing in transactions to which

---

[5]Defendants assert their alternative arguments of release of the fraud claim and affirmation of the Agreement with regard to Brooks's negligent misrepresentation claim as well.  The court has found Defendants are entitled to summary judgment based on the lack of misrepresentations.  Consequently, Defendants alternative arguments are moot and need not be addressed.

the UCC applies.  *U.S. Nat'l Bank of Oregon v. Boge*, 311 Or. 550, 564 (1991).

OR. REV. STAT. 71.3040 provides "[e]very contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement."  "Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." OR. REV. STAT. 71.2101(t) (2016).  This provision encompasses "both a subjective standard (honesty in fact), as well as an objective standard (reasonable commercial standards of fair dealing)." *Wanke Cascade Distribution Ltd. v. Forbo Flooring Inc.*, No. 3:13-cv-768-AC, 2013 WL 6493099, at *4 (D. Or. Aug. 20, 2013).  "The obligation of good faith does not vary the substantive terms of the bargain or of the statute, nor does it provide a remedy for an unpleasantly motivated act that is expressly permitted by contract or statute." *Boge*, 311 Or. at 567.  Moreover, "[t]he obligation to act in good faith does not bar a party from enforcing whatever legal rights he possesses." *Id*. at 568 (citation omitted).

B.  *Failure to Pay Note*

Brooks argues Defendants' failure to make reasonable and diligent efforts to pay the Note violates the statutory duty of good faith.  In denying Brooks's motion to compel production of Defendants' financial records needed to establish Defendants' ability to pay the Note, the court noted the Agreement does not contain a provision requiring Caswell Sculptures to take steps necessary to ensure it has the ability to pay the Note in full.  (Order, ECF No. 81 ("Order"), at 5.)  The court explained the duty of good faith "cannot be used to add terms to a contract or to contradict the contracts' existing terms" and found Brooks's theory of good faith with regard to the payment of the Note "would impose a contractual obligation on [Caswell Sculptures] she did not negotiate and a duty on [Caswell Sculptures] it did not undertake."  (Order at 6.)

Nowhere in the Agreement, Note, or Security Agreement do Defendants promise to pay the Note in full in a timely manner.  To the contrary, Defendants refused to agree to Caswell being personally liable under the Note and offered the Molds as the sole collateral.  The Agreement and Security Agreement provide an express remedy for Brooks in the event of Caswell Sculptures's default on the Note, clearly establishing the parties' understanding Caswell Sculptures could decide to not pay the Note.  Imposing an obligation on Caswell Sculptures to pay the Note would vary the express terms of the parties' bargain.  Defendants' motivation for electing to not pay the Note and allow Brooks to take possession of the Molds is not relevant where the parties agreed Defendants could elect such option.

### C.  Failure to Cast Sculptures

In her complaint, Brooks alleges she "reasonably expected that [Caswell Sculptures] would sell and produce new copies of Caswell's previous sculptures in the ordinary course of business" and that failure to do so was commercially unreasonable.  (Am. Comp. ¶ 58).  The Agreement and Security Agreement authorize Defendants to cast sculptures from the Molds prior to a default and Brooks's foreclosure on the Molds.  (Hahs 2014 Decl. Ex. A at 13; Ex. C at 3.)  The Settlement Agreement also requires Defendants to pay the net proceeds from the sale of any such sculptures to Brooks, which shall be immediately credited to Caswell Sculptures as a payment on the Note.  (Hahs 2014 Decl. Ex. A at 13.)

Nothing in the Agreement or Security Agreement require Defendants to cast additional sculptures from the Molds however.  Defendants had the ability to cast such sculptures as a means of paying down the Note but were under no obligation to do so. The court will not impose an obligation on Defendants where the parties failed to negotiate for such obligation.  Defendants did

not act in bad faith but merely exercised their right not to continue to cast sculptures from the Molds.

### D.  Representing Sculptures Were Sold Out

For the first time in her opposition brief, Brooks argues Defendants breached its statutory duty of good faith and fair dealing "by deterring potential customers from purchasing sculptures from those molds, and inaccurately stating that the editions were entirely sold out even though many productions remain."  (Pl.'s Resp. in Opp'n to Defs.' Mots. for Summ. J., ECF No. 159, at 31.)  A district court need not consider new theory of liability raised for the first time in summary judgment briefing, *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-92 (9th Cir. 2000), and the court rejects it for that reason.  However, even assuming the theory was properly raised, it does not support a claim for breach of the statutory duty of good faith.

Brooks's new theory appears to rely on actions taken by Caswell Sculptures after default and relinquishment of ownership of the Molds by by Caswell.  On two occasions, Caswell Sculptures advised customers interested in purchasing sculptures cast from the Molds they were sold or cast out. Brooks appears to argue Defendants should have referred the customers to her or explained how the customers could obtain such sculptures.  The only provision in the Agreement relating to use of the Molds after default requires Caswell to provide a certificate of authenticity for any sculptures cast from the Molds by Brooks or her transferee.  The Agreement contains no provision that requires Defendants to refer customers or prospective customers to Brooks, and imposing such an obligation now would create a term in the contract the parties did not negotiate.

### E. Conclusion

The statutory duty of good faith found in the UCC applies to the Agreement, Security Agreement and Note.  Such duty prohibits the court from imposing obligations or conditions that

alter the parties' bargain or the substantive terms of the contract. Nothing in the Agreement, Security Agreement, or Note requires Defendants to pay the Note in full, cast sculptures from the Mold, or refer customers to Brooks after default. Consequently, Defendants are entitled to summary judgment on Brooks's Fourth Claim for Relief for breach of the duty of good faith and fair dealing.

IV. Sixth Claim for Relief – Elder Financial Abuse

A claim for elder financial abuse lies "when a person wrongfully takes or appropriate money or property of a vulnerable person." OR. REV. STAT. 124.110(1)(a) (2016). "A statutory claim for financial abuse has four elements: there must be (1) a taking or appropriation (2) of money or property (3) that belongs to an elderly or incapacitated person, and (4) the taking must be wrongful." *Church v. Woods*, 190 Or. App. 112, 117 (2003). Brooks alleges "Defendants wrongfully took Brooks's property and money via misrepresentation . . . " (Am. Compl. ¶ 66.)

The Oregon courts have interpreted the term "wrongful" in the context of an elder abuse claim to include improper motive or by improper means. *Church*, 190 Or. App. 118-19. Misrepresentation qualifies as improper means. *Id*. at 118. The court has found Defendants did not make any false or actionable representations with regard Brooks's fraud and negligent misrepresentation claims, and Brooks does not allege any new misrepresentations in support of her elder abuse claims. With regard to improper motive, Brooks asserts Defendants appropriated a release by Brooks of over $1,000,000 for the sole purpose of damaging Brooks. Brooks has offered no evidence of such improper motive, other than Defendants' allegedly deficient performance nearly a year after the Agreement was signed. Brooks has failed to present evidence of an improper motive at the time the Agreement was signed. Consequently, Defendants are entitled to summary judgment on Brooks's Sixth Claim for Relief.

*Conclusion*

Defendants' motion (ECF No. 143) for summary judgment on Brooks's First, Second, Fourth, and Sixth Claims for Relief is GRANTED.  Defendants' motion (ECF No. 166) to strike the Koenke Declaration is denied as moot.

DATED this 27th day of October, 2016.


      /s/ John V. Acosta       

JOHN V. ACOSTA
United States Magistrate Judge
