UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


GRETCHEN BROOKS, an individual,                          Case No.: 3:14-cv-1232-AC

                             Plaintiff,                  OPINION AND ORDER

           v.

HARLON RIP CASWELL, an individual,
RIP CASWELL SCULPTURES, INC., an
Oregon corporation d/b/a CASWELL
GALLERY, an Oregon assumed business
name, CASWELL PROPERTIES, INC.,
a Washington limited liability company,
and DOES 1-5,

                             Defendants.
_____

ACOSTA, Magistrate Judge:

*Introduction*

        Plaintiff Gretchen Brooks ("Brooks") filed this action against defendants Harlon Rip Caswell


PAGE 1 - OPINION AND ORDER                                              *{sib}*

("Caswell"), Rip Caswell Sculptures, Inc., dba Caswell Gallery ("Caswell Sculptures"), and Caswell Properties, LLC ("Caswell Properties")(collectively "Defendants") seeking damages related to Defendants' alleged wrongful conduct with regard to the settlement of a prior lawsuit. The sole claim remaining in this lawsuit is Caswell Sculptures's counterclaim under OR. REV. STAT. 79.0625. Currently before the court is Brooks's motion for summary judgment on this counterclaim.

The court finds Brooks acted in good faith in filing this lawsuit and had no duty to take possession of the Molds in a timely manner. Accordingly, Brooks's motion for summary judgment on Caswell Scupltures's counterclaim under OR. REV. STAT. 79.0625 is granted.[1]

*Background*[2]

From 2006 to 2009, Brooks advanced more than $5,000,000 to Caswell Sculptures and Caswell Properties to facilitate development of Caswell's sculpture business. (Hahs Decl. dated December 10, 2014, ECF No. 16 ("Hahs 2014 Decl."), Ex. A at 1; Seidl Decl. dated May 9, 2016, ECF No. 144 ("Seidl May Decl."), Ex. 1 at 9-11. ) The relationship between Brooks and Caswell deteriorated, and in January 2010 Brooks filed a lawsuit in state court seeking recovery of her advances and alleging breach of implied and express contract, money had and received, fraud, misrepresentation, and claim and delivery. (Hahs 2014 Decl. Ex. A, at 1. )

/ / / / /

/ / / / /

---

[1]The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

[2]The factual background summary is derived from declarations and evidence associated with motions for summary judgment previously filed by the parties as well as those filed with the present motion.

In August, 2011, Brooks initiated settlement discussions with Defendants to resolve complicated issues remaining for the court after a jury trial.  (Seidl May Decl. Ex. 6 at 1; Hahs 2014 Decl. ¶ 4; Hahs Decl. dated February 23, 2015, ECF No. 31 ("Hahs 2015 Decl."), ¶ 9.)  Brooks's initial proposal included a promissory note from Defendants to Brooks in the amount of $850,000 payable in graduated payments over a seven-year term with interest accruing at a rate of four per cent per annum.  (Hahs 2015 Decl. Ex. 13 at 4.)  Caswell requested a decrease in the note from $850,000 to $650,000.  (Brooks Dep. dated July 2, 2015 ("First Brooks Dep.") 41:1-422.)  He also refused to be personally liable on the note, but suggested the note be secured solely by identified collateral. (Monson Dep. dated February 18, 2015 ("Monson Dep.") 59:3-17.)  Brooks agreed to Caswell's demands based, in part, on assurances from an unidentified source Caswell Sculptures would pay the note if the principal was reduced.  (Monson Dep. 59:3-20; First Brooks Dep. 41:1-44:5, 48:0-49:4.)

The parties executed a Settlement Agreement and Mutual Release on September 21, 2011 (the "Settlement").  (Hahs 2014 Decl. Ex. A.)  As part of the Settlement, Brooks released Defendants:

> from any and all claims, rights demands, actions, causes of action, suits, damages, liabilities, costs, expenses, and losses of any kind or character whatsoever, whether presently known or unknown, asserted or unasserted, contingent or noncontingent, that any of the Brooks Releasors have, may have had, or may claim to have against any of the Defendant Releasees for any "**Released Claim**," defined as any claim arising from or related to acts, events, or omissions by any Party occurring on or before the Effective Date of this Agreement, including but not limited to, the Disputed Claims and all claims of any kind that could have been alleged by or on behalf of any Party.

(Hahs 2014 Decl. Ex. A, at 20.)  The parties further acknowledged:

that they may hereafter discover facts in addition to or different from those which they now believe to be true with respect to the subject matter released herein, but agree that they have taken that possibility into account in reaching this Agreement and that, notwithstanding the discovery or existence of any such additional or different facts, as to which they expressly assume the risk, and in consideration for the mutual covenants, promises, and releases set forth in this Agreement, they fully, finally, and forever settle and release any and all such claims, known or unknown, suspected or unsuspected, contingent, or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed upon any theory of law or equity, including but not limited to conduct which is negligent, intentional, with or without malice, or a breach of any duty, law, or rule, without regard to the subsequent discovery or existence of such different or additional facts.

(Hahs 2014 Decl. Ex. A, at 21.)  However, the Agreement did not "affect, inhibit, or limit" a party's right to assert claims for conduct arising after the signing of the Agreement, specifically including Brooks's right to enforce the Agreement or her security interests in the Molds, or allege claims for breach of the Agreement.  (Hahs 2014 Decl. Ex. A, at 21.)

Pursuant to the Settlement, Caswell Sculptures executed a promissory note in the amount of $650,000 payable to Brooks (the "Note") and a Security Agreement (the "Agreement") identifying fifty-five sculpture molds (the "Molds") servings as security for the payment of the Note. (Hahs 2014 Decl. Exs. A, B, and C.)  Payments under the Note were deferred until March 1, 2012, when minimum monthly payments of $2,500 became due for three consecutive months.  (Hahs 2014 Decl. Ex. A, at 10.)  In June 2012, the minimum monthly payments increased to $4,000 for a year, with reamortization of the Note in July 2013, to ensure payment in full by the end of the seven-year term. (Hahs 2014 Decl. Ex. A, at 10.)  Brooks agreed to the payment schedule in response to Caswell's desire to not make a promise he could not keep or to immediately default on the Note.  (Walker Dep. dated February 16, 2015 ("Walker Dep.") 73:23-74:7.)

In the event of default on the Note, Caswell Sculptures had fifteen days to cure such default after written notice from Brooks.  (Hahs 2014 Decl. Ex. B, at 1.)  Brooks's sole remedy for an uncured default was to foreclose on and take possession of the Molds.  (Hahs 2014 Decl. Ex. A, at 10-11, Ex. B, and Ex C. )  Based on her extensive experience with Caswell, Brooks "believed he assigned significant value to these molds and would not want to lose them."  (Brooks Decl. ¶ 11.)

The Molds were to be delivered to Parks Bronze ("Parks") by November 16, 2011, for storage and remain there until the Note was satisfied or Brooks enforced her rights under the Agreement following a payment default.  (Hahs 2014 Decl. Ex. A, at 12.)  Prior to a foreclosure of her security interest in the Molds by Brooks, Defendants retained the right to cast and sell sculptures from the Molds to third parties on commercially reasonable terms with the net proceeds from the sale of any such sculpture paid to Brooks.  (Hahs 2014 Decl. Ex. A, at 13.)  Any funds received by Brooks for such sales would be credited to Caswell Sculptures as a payment on the Note.  (Hahs 2014 Decl. Ex. A, at 13.)

On August 3, 2012, Brooks emailed a notice of default on the Note to Defendants based, primarily, on Caswell Sculptures failure to pay the $4,000 due under the Note on August 2, 2012. (Hahs 2014 Decl. Ex. D.)   In response, Defendants advised Brooks that Caswell Sculptures would not be making the August payment and Brooks was free to exercise her rights to the Molds.  (Hahs 2014 Decl. Ex. E at 1.)

In September 2012, the parties discussed the transfer of possession of the Molds to Brooks, who had yet to decide how, when, or where to transfer the Molds.  (Hahs 2014 Decl. ¶ 13.)  On October 4, 2012, Defendants informed Brooks of Caswell's intent to move sculpture molds he owned from Parks, where they were stored with the Molds, to another location.  (Hahs 2014 Decl.

Ex. F.)  Caswell would leave the Molds securing the Note at Parks and recommended Brooks contact

Parks to arrange payment for future storage fees relating to the Molds.  (Hahs 2014 Decl. Ex. F.)

Brooks's counsel, Laura Walker ("Walker"), indicated she was not sure if Brooks even

wanted the Molds and suggested Caswell make Brooks an offer to purchase the Molds.  (Caswell

Dep. dated August 19, 2015 ("Caswell Dep.") 80:15-20; Hahs Dep. dated April 17, 2015 ("Hahs

Dep.") 50:8-12.)  Andrew Hahs, Caswell's legal counsel ("Hahs") responded:

> Rip has received no interest in castings from the molds in which Gretchen has the
> security interest and he believes they have little value.  However, as a one-time offer,
> Rip is willing to pay Gretchen $10,000 to release her security interest in all the
> molds.  Let me know in the next seven days if she is interested in this offer.  If not,
> Rip will proceed to unload the molds and leave them at Parks.  We can then finalize
> the surrender agreement.

(Hahs 2014 Decl. Ex. F at 1.)

In January 2013, Brooks drafted a collateral surrender agreement detailing the transfer of the

Molds and forwarded the draft to Defendants in February 2013.  (Hahs 2014 Decl. ¶¶ 16, 17.)

Defendants returned the draft to Brooks with requested changes, including a demand the surrender

agreement include a release of liability.  (Hahs 2014 Decl. ¶ 17; Walker Decl. dated July 14, 2016,

ECF No. 163 ("Walker Decl.") ¶ 4.)  Brooks was unwilling to release Defendants from liability

under the Note before having the opportunity to inspect the Molds and Caswell was unwilling to

allow Brooks access to the Molds until a collateral surrender agreement releasing Defendants from

liability had been signed.[3]  (Walker Decl. ¶ 4; Brooks Decl. dated July 15, 2016, ECF No. 161

("Brooks Decl."), ¶ 20.)

---

[3]Defendants dispute Brooks's representation that she was denied access to the Molds for the
first time in the declaration of Andrew Hahs dated November 19, 2016, and filed with the court in
opposition to Brooks's motion for summary judgment on Defendants's counterclaim.  (Hahs Decl.
dated November 29, 2016, ECF No. 192, ¶¶ 24-27.)

In April 2013, after hearing nothing more about the Molds from Brooks, Defendants contacted Brooks to reiterate their offer to purchase the Molds and discuss the transfer of possession of the Molds.  (Hahs 2014 Decl. ¶ 18.)  Brooks formally rejected the offer on April 8, 2013, and advised Defendants she intended to take possession of the Molds at a later date.  (Hahs 2014 Decl. ¶ 19, Ex. H.)  The Molds remained at Parks and were fully accounted for as of October 27, 2015. (Honore Decl. Ex. 14 at 3.)

Brooks filed this lawsuit on July 31, 2014, asserting claims for fraud, negligent misrepresentation, breach of contract, breach of the duty of good faith and fair dealing, conversion, and elder financial abuse based on allegations Caswell never intended to pay the Note and converted the Molds to his use.  Brooks filed a First Amended Complaint on June 30, 2015, alleging the same claims but including additional factual support (the "Complaint").  On April 6, 2016, Defendants filed their Answer, Affirmative Defenses, and Counterclaims to the Complaint asserting counterclaims under Oregon's Uniform Commercial Code (the "UCC"), specifically OR. REV. STAT. 79.0625, and for restitution or disgorgement (the "Answer").

All of Brooks's claims have been dismissed voluntarily or through motion practice.  On July 16, 2015, Brooks filed a notice of limited dismissal of her Third Claim for Relief for breach of contract to the extent it relied on OR. REV. STAT. 72.7190.  (Notice of Limited Partial Dismissal of Pl.'s Third Claim for Relief, ECF No. 83.)  In an Opinion and Order entered March 14, 2016, the court granted Defendants' Motion for Partial Summary Judgment Re: Claim of Missing Molds, finding  Defendants had materially complied with the terms of the Settlement requiring delivery of the Molds to Parks for storage and properly maintained the Molds while they were in storage, at least through April 2015. *Brooks v. Caswell*, Case No. 3:14-cv-01232-AC, 2016 WL 1056977, at *5, *6

(D. Or. March 14, 2016)("*Brooks I*").  As a result, the court dismissed the remaining claims alleged

in Brooks's Third Claim for Relief for breach of contract and the entirety of Brooks's Fifth Claim

for Relief for conversion, and dismissed Brooks's First Claim for Relief for fraud, Second Claim for

Relief for negligent misrepresentation, and Sixth Claim for Relief for elder financial abuse to the

extent those claims relied on allegations of missing or damaged Molds.  *Id*. at *5,*7.  Finally, the

court granted Defendants' Motions for Summary Judgment on the remaining claims in an Opinion

and Order entered October 27, 2016.  *Brooks v. Caswell*, Case No. 3:14-cv-01232-AC, 2016 WL

6305980 (D. Or. Oct. 27, 2016)("*Brooks II*").  The court found the evidence Brooks offered was

insufficient to establish Defendants made any false representations regard to their duty to pay or the

value of the Molds, a breach of the statutory duty of good faith with regard to terms of the settlement

documents, or improper motive at the time of negotiation and execution of the Settlement.  *Id*. at *1.

    With Brooks's claims fully resolved, only the counterclaims alleged by Defendants in the

Answer remain at issue.  Defendants represented their intent to dismiss their Second Counterclaim

for restitution and disgorgement at a scheduling conference on November 4, 2016, leaving only

Caswell Sculptures's First Counterclaim under OR. REV. STAT. 79.0625 at issue.  Brooks now

moves for summary judgment on this counterclaim.

*Legal Standard*

    Summary judgment is appropriate where the "movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a) (2016).  Summary judgment is not proper if material factual issues exist for trial.  *Warren v.

City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2013). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

In the First Counterclaim, Caswell Sculptures alleges Brooks, as a secured creditor, "violated the obligation of good faith in the performance of enforcement of the Non-Recourse Promissory Note and Security Agreement" imposed in the UCC. (Defs.' Answer, Affirmative Defenses, and Countercls. to First Am. Compl., ECF No. 138 ("Defs.' Answer"), ¶ 88.) Specifically, Caswell Sculptures alleges Brooks breached her duty of good faith by: (1) filing this lawsuit in an attempt to avoid the terms of the Note; and (2) failing to immediately accept the Molds as the sole remedy for breach of the Note. (Defs.' Answer ¶¶ 90, 91. ) Defendants seek "judgment against Brooks ordering that she accept the collateral in full and final satisfaction of the obligation," "an award of losses sustained as a result of Brooks' failure to comply with her duties under the UCC including, without limitation, the reasonable value of Defendants' staff time required by this litigation," and "an award of its reasonable attorney fees and litigation expenses."[4] (Defs.' Answer ¶¶ 92, 94, 95.)

The court has previously found, and the parties agree, the Note and Agreement are subject to the UCC. *Brooks II*, 2016 WL 1056977, at *11. OR. REV. STAT. 79.0625(1) provides, in pertinent part: "[i]f it is established that a secured party is not proceeding in accordance with this chapter, a court may order or restrain collections, enforcement or disposition of the collateral on appropriate terms and conditions." A person who fails to comply with Chapter 9 may also be liable for damages resulting from such failure. OR. REV. STAT. 79.0625(2). Finally, the prevailing party in an action brought under OR. REV. STAT. 79.0625 may be entitled to an award of reasonable

---

[4]Caswell Sculptures also requested a "judgment against Brooks restraining her from collection or enforcement of the obligation against [Caswell], individually." (Defs.' Answer ¶ 93.) In its response to Brooks's motion for summary judgment, Defendants' concede Caswell Sculptures, the obligor under the Note and Agreement, is the only defendant entitled to relief under OR. REV. STAT. 79.0625.

attorney fees.  OR. REV. STAT. 79.0625(3).

I.  Filing this Lawsuit

Caswell Sculptures alleges Brooks "breached her duty of good faith by attempting to enforce the Non-Recourse Promissory Note by means that Brooks had expressly agreed were prohibited. While continuing to insist upon the validity and enforcement of the Non-Recourse Promissory Note, Brooks filed suit claiming, without good faith, that the non-recourse provision of the Promissory Note was not enforceable."  (Defs.' Answer ¶ 91.)  Brooks contends the express provisions of both the UCC and the Agreement allowed her to file this action prior to foreclosing on the Molds. Alternatively, Brooks claims she filed this lawsuit with the requisite good faith.

*A.  The UCC*

OR. REV. STAT. 79.0601 provides, in pertinent part:

> (1) After default, a secured party has the rights provided in ORS 79.0601 to 79.0628 and, except as otherwise provided in ORS 79.0602, those provided by agreement of the parties.  A secured party:

> (a)  May reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest or agricultural lien by any available judicial procedure.

> * * *

> (3) The rights under subsection[] (1) . . . of this section are cumulative and may be exercised simultaneously.

The Oregon courts have construed this provision and found:

> under the plain text of the statute, a secured party may, among other things, pursue a claim on the debt or seek to foreclose on the underlying security interest.  Further, the text provides that those rights are cumulative such that the creditor may seek to enforce one remedy and ignore another or seek to enforce more than one remedy at the same time.

*VFS Financing, Inc. v. Shilo Mgmt. Corp.*, 277 Or. App. 698, 702-03 (2016).  The *Shilo Mgmt.* court

then analyzed whether the secured party's filing of an lawsuit seeking damages on a note or guaranty while retaining possession of the collateral was commercially reasonable or honest in fact and found, based on existing New York law, the secured party's actions were in good faith and authorized under the UCC. *Id.* at 703-04, 707. Accordingly, the court impliedly found OR. REV. STAT. 79.0601 did not authorize a secured creditor to pursue any and all cumulative remedies, but rather only those that were valid and could be brought in good faith. *Id.* at 703 ("The specific issue here, however, is whether a plaintiff acts in bad faith or in a commercially unreasonabl[e] manner when it pursues a valid note or guaranty claim, but does not also move quickly to sell the collateral that secures the note or guaranty.")

Moreover, the express language of OR. REV. STAT. 79.0601 limits a secured party's allowed cumulative remedies to actions reducing a claim to judgment, foreclosing, or otherwise enforcing the security interest by any available judicial proceeding. The statute, as evidenced by the cases Brooks relies on, allows a secured party to attempt to enforce the parties' agreement by concurrently seeking claims for damages on the note or underlying guaranty, levying or judicially foreclosing on the collateral, or selling the collateral, all pursuant to the terms of the agreement. *See Shilo Mgmt.*, 277 Or. App. at 707 (secured creditor allowed to sue for damages on a note and guaranty while retaining possession of the collateral); *In Re King*, No. 08-61922, 2010 WL 4290527, at *3 (Bankr. N.D.N.Y. Oct. 20, 2010)(secured creditor allowed to sue on debt while retaining security interest in collateral remaining in possession of debtor); *Snake River Equip. Co. v. Christensen*, 107 Idaho 541, 545 (1984) (secured creditor allowed to pursue judicial remedy to obtain judgment on the underlying notes before repossessing and selling collateral); *Peoples Nat. Bank of Wash v. Peterson*, 7 Wash. App. 196, 199 (1972) ("[W]e believe plaintiff was entitled: to institute an action on the promissory

notes and obtain judgment for the unpaid balance thereof; to hold a private or public sale of the property in the secured party's possession and credit the moneys received therefrom against the total of defendants' indebtedness; and in addition thereto, to judicially foreclose upon the security in the event the private or public sale is abandoned without prejudice to the debtor or fails to dispose of all the property described in the security instruments.")

Here, Brooks claims Defendants breached the Settlement and attacks the validity of the Agreement and Note based on allegations of misrepresentations made by Defendants which induced her to enter into the Settlement. She is not pursuing a judgment on the debt or seeking to enforce the foreclosure rights afforded her in the Settlement, Note, and Agreement. The court is not convinced OR. REV. STAT. 79.0601 provides Brooks the protection to which she claims she is entitled – the unequivocal right to pursue any legal action prior to foreclosing on or accepting possession of the Molds.

*Shilo Mgmt.* establishes the mere pursuit of alternative or cumulative remedies by secured creditor is not, in and of itself, a bad faith action. But, a secured creditor is not entitled to pursue any and all remedies, regardless of their merit. Consequently, OR. REV. STAT. 79.0601 does not relieve a secured party seeking alternative or cumulative remedies from the obligation of pursuing such remedies in good faith.

### B. The Agreement

Brooks argues the Agreement expressly grants her the right to pursue alternate remedies relating to the formation of the Agreement before foreclosing on the Molds. Specifically, Brooks references Section 7.4 of the Agreement, which provides: "Upon default and at any time after default, Secured Party may declare the entire amount secured immediately due and payable and, in

PAGE 13 - OPINION AND ORDER                                    *{sib}*

addition to the remedies described in Sections 7.1-7.3 above, shall have all the rights and remedies of a secured creditor under the Uniform Commercial Code, at law, in equity or otherwise," and Section 8.2, which provides: "All Secured Party's rights and remedies, whether evidenced here or by other writing, shall be cumulative and may be exercised singularly or concurrently."

The Agreement gives Brooks no more rights than those afforded her by the UCC. For the reasons stated above, Brooks was not expressly entitled to pursue claims attacking the validity of the Note and Agreement without consideration of whether her actions were in compliance with the good faith requirement applicable to commercial transactions.

### C. Good Faith

#### 1. Proper Standard

OR. REV. STAT. 71.3040 provides "[e]very contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement." "Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." OR. REV. STAT. 71.2101(t) (2016). This provision encompasses "both a subjective standard (honesty in fact), as well as an objective standard (reasonable commercial standards of fair dealing)." *Wanke Cascade Distribution Ltd. v. Forbo Flooring Inc.*, No. 3:13-cv-768-AC, 2013 WL 6493099, at *4 (D. Or. Aug. 20, 2013). "The obligation of good faith does not vary the substantive terms of the bargain or of the statute, nor does it provide a remedy for an unpleasantly motivated act that is expressly permitted by contract or statute." *U.S. Nat'l Bank of Oregon v. Boge*, 311 Or. 550, 567 (1991). Moreover, "[t]he obligation to act in good faith does not bar a party from enforcing whatever legal rights he possesses." *Id*. at 568 (citation omitted).

Caswell Sculptures asserts Brooks filed this action in violation of her good faith duty under the UCC. It claims Brooks did not have sufficient facts to support her claims and that her claims are legally barred.

### 2. Factual Basis

While the court granted summary judgment in favor of Defendants on all of Brooks's claims, this does not automatically equate to a finding Brooks's filing of this action was dishonest or commercially unreasonable. Brooks predicated her lawsuit on two primary issues: 1) Defendants' misrepresentations with regard to their intent to pay the Note and the value of the Molds; and 2) Defendants' actions with regard to the Molds.

At the time she filed this lawsuit, Brooks felt Defendants tricked her into agreeing to the Settlement by falsely representing their intent to pay the full amount of the Note and the value of Molds securing such payment. Brooks had received assurances from an unidentified individual that Defendants would pay the Note if the amount initially requested was reduced. Additionally, Brooks agreed to defer payments and accept minimal monthly payments during the first year of the Note to accommodate Caswell's desire to keep his promises and not immediately default on the Note. Brooks believed Caswell had fraudulently induced her to enter into a prior loan arrangement and had previously testified Caswell has a habit of lying, is not noted for his truthfulness, and is not highly valued or regarded. Based on this evidence, any reasonable trier of fact would find Brooks honestly believed she had a valid claim against Defendants for fraud and misrepresentation based both on Defendants' intent to pay the Note and the value of the Molds when she filed this lawsuit especially within the context of the parties' acrimonious failed business relationship and state court lawsuit.. Evidence discovered by Brooks after she filed the lawsuit and arguments made by Defendants which

resulted in summary judgment in their favor does not refute the only reasonable finding that Brooks acted with "honesty in fact" in filing this action.

Additionally, Brooks questioned whether all of the Molds had been delivered to Parks and properly maintained as required under the Settlement. The evidence presented established Brooks requested access to the Molds in early 2013, but Defendants were unwilling to allow such access until a collateral surrender agreement releasing Defendants from liability had been signed.[5] Accordingly, she filed this action without the ability to inspect the Molds. Defendants can not reasonably claim Brooks filed this action in bad faith because she had no facts to support this theory when Defendants themselves deprived her of access to the Molds and to the necessary facts. In any event, Defendants admit part of the "Fighting Back" mold was not timely transferred to Park, a discrepancy the court subsequently found to be inconsequential and without resulting damages. *Brooks I*, 2016 WL 1056977, at *5. However, Defendants' failure to transfer possession of all of the Molds to Parks by November 16, 2011, was a breach of the Settlement and unequivocally establishes Brooks was justified in filing her claims based on missing Molds.

The court finds the evidence establishes there is no genuine issue of material fact that Brooks honestly believed she had legitimate grounds for filing this lawsuit and was, in fact, so justified. Additionally, the court finds it commercially reasonable for a secured party to challenge agreements through which a security interest is created where evidence supporting such challenge exists. Accordingly, the court finds, as a matter of law, Brooks filed this lawsuit in good faith and did not violate Chapter 9 of the UCC by doing so.

---

[5]This was in violation of the Settlement which required Defendants to authorize and direct Parks to "provide Brooks (or her designated agent) with access to view and inspect the Molds at any time during business hours." (Hahs 2014 Decl. Ex. A at 12.)

### 3.  Legally Barred

Caswell Sculptures contends Brooks's claims were legally barred by the doctrine of election of remedies, as well as the release and waiver of the claims found in paragraph 18 of the Settlement, and therefore, could not have been filed in good faith.  The mere existence of a defense does not make the filing of a claim in bad faith.

The defenses Caswell Sculptures relies on are based on Brooks's claims and the terms of the Settlement, Note, and Agreement.  While Caswell Sculptures asserts these defenses clearly barred Brooks's claims from the time the action was filed, they failed to move for dismissal of the lawsuit on these grounds.

Caswell Sculpture asserts the doctrine of election of remedies bars a party from seeking to set aside a contract while retaining the benefits of the contract.  However, Brooks alleged, in part, that Defendants violated the terms of the Settlement by failing to transfer all of the Molds to Parks in a timely manner and sought damages related thereto. This claim does not violate the election of remedies doctrine.  Additionally, Brooks alleged a tort claim and statutory claim which do not directly implicate the election of remedies doctrine.  Finally, the defenses of release and waiver are based on the terms of the Settlement, a document Brooks claims she was fraudulently induced to sign.  To the extent Brooks's claims for fraud and misrepresentation were filed in good faith, the defenses of release and waiver could not serve to bar the lawsuit until Brooks's claims, and the validity of the Settlement, were resolved.

The UCC authorizes a secured party to initiate cumulative remedies concurrently or in whatever order they deem appropriate.  However, the initiation of such remedies must still be made in good faith.  Any reasonable trier of fact would find, based on the information available to Brooks

at the time she filed this lawsuit, that Brooks acted with honesty in fact and in a commercially reasonably manner.[6]  Caswell Sculptures's assertion of defenses which related to only some of Brooks's claims or required resolution of Brooks's fraud and misrepresentation claims did not legally bar this lawsuit *ab initio* or alter the conclusion this lawsuit was filed in good faith and in accordance with the provisions of the UCC.

## II.  Failure to Accept Molds

Caswell Sculptures alleges "Brooks breached her obligation of good faith, as the secured creditor and she acted in a commercially unreasonable manner, when she refused, without excuse, to accept the collateral serving as the sole remedy for the payment default."  (Defs.' Answer ¶ 90.) Brooks argues her obligation of good faith under the UCC with regard to the Molds is not triggered until, and unless, she possesses or attempts to sell the Molds.  Alternatively, Brooks claims her refusal to accept possession of the Molds prior to resolution of this lawsuit complies with her good faith obligations under the UCC.

Brooks's argument that she had no obligation with regard to the Molds until she took possession of them is grounded primarily in OR. REV. STAT. 79.0207, which requires a secured party to "use reasonable care in the custody and preservation of collateral in the secured party's possession."  Brooks also references other provisions which govern a secured party's disposition of collateral.  *See* OR. REV. STAT. 79.0610 (2016) (every aspect of disposition of collateral must be commercially reasonable); OR. REV. STAT. 79.0627 (2016) (setting forth factors used to determine if disposition of collateral was commercially reasonable).  These provisions relate solely to a secured

---

[6]This finding is limited to a good faith analysis under the UCC and is not applicable to any claim under OR. REV. STAT. 31.230 or Rule 11 of the Federal Rules of Civil Procedure.

party's obligations with regard to collateral already in its possession.

Caswell Sculptures impliedly concedes Brooks does not have actual possession of the Molds by arguing Brooks has had the functional equivalent of possession since the default in September 2012. Caswell Sculptures contends once the default occurred, it had no right to move the Molds or use them in any way, giving Brooks constructive possession of the Molds. This contention is belied by the express provisions of the Agreement,[7] which provide that despite the requirement the Molds be stored at Parks, Caswell Sculptures retained sole ownership in the Molds with the exclusive right to use, but not sell or otherwise encumber, the Molds. Additionally, Caswell Sculptures retained the right to cast sculptures from the Molds. The net proceeds derived from the sale of such sculptures would be paid to Brooks and credited to the amount due under the Note. Caswell Sculptures retained these rights even after default until such time as Brooks enforced her rights under the Agreement or foreclosed on her security interest. In other words, Caswell Sculptures retained the right to cast sculptures from the Molds despite the payment default. The court finds Brooks is not in constructive possession of the Molds and the provisions in Chapter 9 governing the disposition and sale of collateral are not applicable here.

While the provisions Brooks relies on set forth a secured party's obligation to preserve and care for collateral in its possession, they do not address the issue currently before the court: a secured party's responsibility to exercise its rights with regard to the collateral – specifically the right to take possession – within a reasonable period of time. Neither party has identified a provision in Chapter 9 that requires a secured party to take possession of collateral within a reasonable time.

------

[7]The Agreement expressly referenced and incorporated the Settlement provisions in which some of this language is found.

The language of OR. REV. STAT. 79.0625 expressly applies only when "a secured party is not proceeding in accordance with this chapter." In the absence of a provision in Chapter 9 requiring a secured creditor to take possession of collateral in a timely manner, Caswell Sculptures has no claim under OR. REV. STAT. 79.0625 based Brooks's failure to accept possession of the Molds. Caswell Sculptures argues the language of OR. REV. STAT. 79.0625 authorizing a court to order the "collection" of collateral is clear evidence the provision applies to situations where a secured party has not taken possession of the collateral. However, Caswell Sculptures ignores possible scenarios in which a court could order collection of the collateral on behalf of a debtor. For example, OR. REV. STAT. 79.0623 provides debtors a right to redeem collateral by fulfilling their underlying obligation. In the event the secured party failed to return possession of the collateral to the debtor after fulfillment of the debt, the court could, under OR. REV. STAT. 79.0625, enter an order allowing the debtor to collect the collateral from the secured party. In light of this alternative scenario, the court finds the use of the word "collect" in OR. REV. STAT. 79.0625 does not necessarily impose a duty on a secured party to collect the collateral. Moreover, Chapter 9 provides that upon default, a secured party "may take possession of the collateral" implying the absence of a duty to take such possession. OR. REV. STAT. 79.0609. Had the legislature intended to create such a duty, it would have used the mandatory term "shall" rather then the permissive term "may."

Caswell Sculptures offers case law which it claims establishes a requirement a secured party take possession of collateral in a timely manner under Chapter 9. The cases cited by Caswell Sculptures all involved secured parties who obtained possession of the collateral but subsequently failed to handle the collateral in a commercially reasonable manner and are inapposite to the issue here. *Jefferson Loan Co., Inc. v. Session*, 397 N.J. Super. 520, 543 (2008)(auto finance company

repossession of automobile upon purchaser's default and delivery to dealer rather than sale was commercially unreasonable); *United States v. R.T. Enterprises, Inc.*, No. 97-1118-WEB, 1998 WL 166568, at *3 (D. Kan. Jan. 6, 1998)(debtor may assert as defense to secured party's action for unpaid balance of note and guaranty secured party's failure to liquidate seized accounts receivable commercially reasonable manner); *John Deere Leasing Co. v. Fraker*, 395 N.W.2d 885, 886 (1986)(genuine issue of fact existed with regard to commercial reasonableness of secured party's delay of sale of harvester combine repossessed in May 1983 to January 1984, when combines were difficult to sell and generated reduced prices); *Matter of Deephouse Equip. Co., Inc.*, 38 B.R. 400, 405 (1984)(secured party's repossession and retention of collateral for over three years with no serious attempts to sell the collateral was not commercially reasonable.)

Brooks did not take possession of the Molds and has no obligation to maintain or dispose of the Molds in a timely manner. Inclusion of the word "collect" in OR. REV. STAT. 79.0625 does not necessarily impose a duty on a secured party to collect the collateral in light of other possible scenarios giving effect to the word and the use of the permissive term "may" in Chapter 9 with regard to a secured party's ability to possess collateral upon default. The cases relied on by Caswell Sculptures address scenarios in which the secured party repossessed or seized the collateral and do not provide the court with any guidance on the issue at hand, and Caswell Sculptures has failed to offer any cases finding a secured party has an obligation under Chapter 9 to take possession of collateral in a timely manner. Consequently, the court finds Chapter 9 does not impose such requirement. Caswell Sculptures has no action under OR. REV. STAT. 79.0625 for Brooks's failure to take possession of the Molds. In the absence of such action, the court need not consider whether Brooks's actions with regard to the Molds were in good faith.

PAGE 21 - OPINION AND ORDER                                          *{sib}*

*Conclusion*

Brooks's motion for summary judgment on Caswell Sculptures's counterclaim under the

UCC (ECF No. 185) is GRANTED.

DATED this 28th day of December, 2016.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge